FILED IN CHAMBERS
U.S.D.C ATLANTA

Date: May 12 2020

JAMES N. HATTEN, Clerk

By: s/B. Evans
Deputy Clerk

# United States District Court

NORTHERN DISTRICT OF GEORGIA

UNITED STATES OF AMERICA

v.

MAURICE FAYNE, a/k/a "Arkansas Mo"

**CRIMINAL COMPLAINT**

Case Number: 1:20-mj-370
**(UNDER SEAL)**

I, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief. On or about April 28, 2020, in Gwinnett County, in the Northern District of Georgia, the defendant did

knowingly execute and attempt to execute a scheme and artifice to defraud United Community Bank, a financial institution as defined in Title 18, United States Code, Section 20, and to obtain moneys and funds owned by and under the custody and control of United Community Bank, by means of materially false and fraudulent pretenses, representations, and promises, and by the omission of material facts,

in violation of Title 18, United States Code, Section 1344.

I further state that I am a Special Agent of the Federal Bureau of Investigation, and that this complaint is based on the following facts:

PLEASE SEE ATTACHED AFFIDAVIT, WHICH IS INCORPORATED BY REFERENCE HEREIN.

Continued on the attached sheet and made a part hereof.   Yes

*Paul Fike*
Signature of Complainant
Paul Fike

Based upon this complaint, this Court finds that there is probable cause to believe that an offense has been committed and that the defendant has committed it.  Sworn to before me by telephone pursuant to Federal Rule of Criminal Procedure 4.1.

| May 12, 2020 | at | Atlanta, Georgia |
|---|---|---|
| Date | | City and State |

JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

AUSA Russell Phillips / 2020R00423

Signature of Judicial Officer
Issued pursuant to Federal Rule of Criminal Procedure 4.1

# Affidavit

I, Paul Fike, hereby depose and state under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and I have been so employed since 1996. I am currently assigned to the Atlanta Division investigating financial crimes, including wire fraud, mail fraud, bank fraud, and securities fraud. I am a law enforcement officer of the United States within the meaning of 18 U.S. C. §2510(7), and I am empowered by law to conduct investigations and to make arrests for federal felony offenses.

2. This affidavit is made in support of a criminal complaint charging Maurice Fayne, a/k/a "Arkansas Mo" (hereinafter, Fayne), with bank fraud in violation of 18 U.S.C. § 1344.

3. This affidavit is based, in part, on my conversations with other law enforcement agents and witnesses, and my review of bank records and other documents. This affidavit does not include every fact known to the government, but only those facts necessary to support a finding of probable cause to support the issuance of the requested arrest warrant.

## Applicable Criminal Laws

4. The bank fraud statute, 18 U.S.C. § 1344, makes it a federal crime for anyone to knowingly execute or attempt to execute a scheme and artifice to defraud a financial institution, as defined in 18 U.S.C. § 20, or to obtain moneys and funds owned by and under the custody and control of a financial institution, by means of materially false and fraudulent pretenses, representations, and promises, and by the omission of material facts.

## The Paycheck Protection Program

5. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020 and was intended to provide emergency financial assistance to millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

6. In order to obtain a PPP loan, a qualifying business must submit a PPP loan application, which must be signed by an authorized representative of

the business. The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) must state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures are used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

7. A PPP loan application must be processed by a participating financial institution (the lender). If a PPP loan application is approved, the participating financial institution funds the PPP loan using its own monies, which are 100% guaranteed by Small Business Administration (SBA).

8. PPP loan proceeds must be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period of time (usually eight weeks of receiving the proceeds) and uses at least 75% of the PPP loan proceeds on payroll expenses.

### Flame Trucking Inc.

9. According to records on file with the Georgia Secretary of State:

    a. Fayne incorporated Flame Trucking Inc. ("Flame Trucking") on April 4, 2019;

    b. Fayne is the CEO and CFO of Flame Trucking; and

    c. Flame Trucking's principal office is located at 4029 Mountain Side Trail, Dacula, Georgia 30019; and

10. Fayne resides at 4029 Mountain Side Trail, Dacula, Georgia 30019.

### Flame Trucking's PPP Loan Application

11. United Community Bank ("UCB") is a federally insured financial institution and has its headquarters in Blairsville, Georgia. UCB was an approved SBA lender and has participated as a lender in the PPP.

12. On April 15, 2020, Fayne signed and submitted to UCB a PPP loan application in the name of Flame Trucking. Fayne told UCB that Flame Trucking had 107 employees and an average monthly payroll of $1,490,200.

13. In Flame Trucking's PPP loan application, Fayne certified that the loan proceeds would be used to "retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as

specified under the Paycheck Protection Program Rule." Fayne stated that he understood he could be prosecuted for fraud if the PPP loan proceeds were "knowingly used for unauthorized purposes."

14. Flame Trucking's PPP loan application requested a loan in the amount of $3,725,500, and UCB originally funded the loan in that amount on April 22, 2020.

15. But UCB subsequently discovered that the loan exceeded the maximum amount that Flame Trucking could borrow under PPP regulations. Therefore, to comply with the regulations, UCB took back part of the loan proceeds on April 28 and April 30, 2020, thereby reducing the loan amount to $2,045,800.

### Fayne's Fraudulent use of PPP Loan Proceeds

16. On or about April 23, 2020, Fayne used Flame Trucking's PPP loan proceeds to fund a number of wire transfers, including the following:

    a.  $30,000 to D.J;

    b.  $50,000 to M.S.; and

    c.  $350,000 to C.W.

17. The $30,000 wire to D.J. and the $50,000 wire to M.S. were payments on loans.

18. C.W. told a Wells Fargo investigator that she was not an employee of Flame Trucking, and that Fayne is her "brother." C.W. also told the Wells Fargo investigator that, after receiving the $350,000 wire transfer from Fayne, she disbursed that money according to Fayne's directions.

19. C.W.'s bank records show that, on or about April 28, 2020, C.W. wire transferred $84,000 to a jewelry store in Duluth, Georgia for "investment."

20. C.W.'s bank records also show that, on or about April 30, 2020, C.W. wire transferred $40,000 to a woman in Alexander, Arkansas for "child support completion."

21. When C.W. was later interviewed by federal agents, she stated that Fayne is her "godbrother," not her "brother." C.W. also told federal agents that, before she received the $350,000 wire transfer from Fayne, Fayne told her he had received a COVID-19 loan from the U.S. government and would be sending her some of it so that she could handle "payroll" for him when he was not around. C.W. said Fayne told her that both of the wire transfers he directed her to make (one to a jewelry store in Georgia and one to a woman in Arkansas) were for "payroll" purposes.

22. Loan payments, jewelry purchases, and child support payments are not authorized uses of PPP loan proceeds.

23. According to information obtained from the jewelry store, Fayne paid a total of $85,065 (including the $84,000 wire transfer and a cash payment of $1,065) for three pieces of jewelry, specifically: (1) one custom-made 18-karat Rolex 41mm Presidential watch, serial number 5636S3S8, with diamonds, which sold for $52,000; (2) one 10-karat custom-made Cuban bracelet with 34.75 carats of diamonds, which sold for $24,500; and (3) one 14-karat custom-made ring with 5.73 carats of diamonds, which sold for $3,750.

24. The following photograph shows a man, believed to be Fayne, wearing the three pieces of jewelry described above:



25. On April 24, 2020, in support of Fayne's assertion that Flame Trucking had an average monthly payroll of $1,490,200, Fayne sent an email to UCB, attaching what Fayne represented to be October, November, and December 2019 bank statements for Flame Trucking's account at Arvest Bank.

26. According to Arvest Bank, Flame Trucking's account was closed on September 17, 2019.

27. Investigators provided Arvest Bank with copies of the purported October, November, and December 2019 bank statements that were submitted to UCB as part of Flame Trucking's PPP loan application. Arvest Bank reviewed those documents and informed investigators that they were not genuine.

28. On April 27, 2020, Fayne withdrew $65,000 in cash from the UCB account that held the PPP loan proceeds.

### Fayne's False Exculpatory Statements to Federal Agents

29. On May 6, 2020, Fayne was interviewed by federal agents. Fayne admitted that he submitted a PPP loan application on behalf of Flame Trucking. But Fayne claimed that he used all of the PPP loan proceeds to pay payroll and other business expenses incurred by Flame Trucking. And Fayne expressly

denied that he used any of the PPP loan proceeds to pay his personal debts and expenses.

### Search and Seizure Warrants

30. Between May 7 and May 11, 2020, agents executed seizure warrants and seized a total of approximately $503,000 in PPP loan proceeds from three bank accounts used by Fayne to disburse the loan proceeds, including one at UCB, one at Wells Fargo, and one at Navy Federal Credit Union.

31. On May 11, 2020, investigators executed a search warrant at Fayne's residence, which purportedly was also the principal office of Flame Trucking.

32. During the search, agents told Fayne that they had seizure warrants for the three pieces of jewelry described above. Fayne told agents that the jewelry was stored in his bedroom, and agents seized the jewelry as authorized by the seizure warrants. Fayne admitted that he purchased this jewelry with proceeds of the PPP loan that UCB made to Flame Trucking.

33. Fayne told the agents that he believed he had the right to use part of the PPP loan proceeds for "other business purposes" and for "working capital." Fayne also stated that he believed the jewelry would increase in value because *he* would be wearing it, which would make it more valuable.

34. During the search, agents found a bag containing exactly $70,000 in U.S. currency, most of which was bundled in $2,000 stacks and separated with paper wrappers bearing the name "United Community Bank" and stamped "April 23, 2020" or "April 24, 2020." Two bundles of money were in envelopes bearing the name "Navy Federal Credit Union." When asked where he got this cash, Fayne stated that it was his "personal money."

35. During the search, agents seized $9,400 in U.S. currency from the pockets of the clothes Fayne was wearing.

36. During the search, Fayne voluntarily agreed to speak with the agents. Fayne was shown the Arvest Bank statements for October, November, and December 2019, which were submitted to UCB as part of Flame Trucking's PPP loan application. Fayne denied that these were his bank statements, but he admitted that they were transmitted from his email account to UCB. Fayne stated that his employees also had access to his email account. Fayne further stated that the entity identified in those documents as "Heartland Payroll Systems" was not the payroll processor used by Flame Trucking. Fayne claimed that he could not remember the name of the payroll processor Flame Trucking actually used.

37. Agents asked Fayne whether he knows the Arkansas woman who received the $40,000 wire transfer for "child support completion." Fayne stated that he does not know that woman, but he added that he does not know the names of all of his "employees."

38. In Fayne's garage, Agents found a 2019 Rolls-Royce Wraith, VIN: SCA665C53KUX87297, which still had a temporary dealer tag on it. Agents asked Fayne whether he used any of the PPP loan proceeds to purchase that vehicle, and Fayne said: "Kinda, sorta, not really." According to documents available online, the total suggested retail price of that vehicle was $381,975. *See* https://www.bentleygoldcoast.com/2019-rolls-royce-wraith-c-8148.htm, last visited 05/12/2020.

## Conclusion

39. Based on my training and experience, and the information provided in this affidavit, I respectfully submit that there is probable cause to believe that Fayne's conduct, as described above, violated the bank fraud statute, 18 U.S.C. § 1344, and I request that the Court issue a warrant for his arrest on those charges.

### Request for Sealing

40. I further request that the Court order that this affidavit, the proposed criminal complaint, the proposed arrest warrant, the motion to seal, and the proposed sealing Order be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to the target of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give the target an opportunity to flee, destroy or tamper with evidence, change patterns of behavior, intimidate potential witnesses, notify confederates, or otherwise seriously jeopardize the investigation.