```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
 2                      ATLANTA DIVISION

 3  UNITED STATES OF AMERICA,      )
                                   )
 4              Plaintiff,         )  CRIMINAL ACTION FILE
            v.                     )  NO. 1:20-CR-228
 5                                 )
    MAURICE FAYNE,                 )
 6                                 )
                Defendant.         )
 7  _____)

 8

 9
    ----------------------------------------------------------
10
              BEFORE THE HONORABLE JUSTIN S. ANAND
11              TRANSCRIPT OF TAPED PROCEEDINGS
                      DECEMBER 20, 2020
12
    ----------------------------------------------------------
13
    APPEARANCES:
14
    For the Plaintiff:       OFFICE OF THE U.S. ATTORNEY
15                           (By:  Russell Phillips)

16  For the Defendant:       Pro Se

17

18
          Proceedings recorded by mechanical stenography
19         and computer-aided transcript produced by

20
              JANA B. COLTER, FAPR, RMR, CRR, CRC
21                 Official Court Reporter
                  1949 U.S. Courthouse
22               75 Ted Turner Drive, SW
                 Atlanta, Georgia  30303
23                  (404) 215-1456

24

25
```

```
 1                       _  _  _

 2                  P R O C E E D I N G S

 3      (Atlanta, Fulton County, Georgia, December 22, 2020, in

 4  open court.)

 5                  (Recording began at 12:37:57)

 6          THE COURT:  -- and Mr. Fayne is here for himself.

 7          Mr. Fayne, are you -- are you still representing

 8  yourself in this matter or do you have counsel?

 9          THE DEFENDANT:  I still don't have counsel,

10  Your Honor.

11          THE COURT:  I'm sorry, can you --

12          THE DEFENDANT:  I still don't have counsel.

13          THE COURT:  Okay.  Well, I guess, are you still

14  operating as your own attorney in this case --

15          THE DEFENDANT:  Yes, sir.  Yes, sir.

16          THE COURT:  -- as allowed by Judge Larkins?

17          THE DEFENDANT:  Yes, sir.

18          THE COURT:  Okay.  All right.  We're here for a

19  hearing on the petition for revocation of bond.

20          Mr. Phillips, you may proceed.

21          MR. PHILLIPS:  Your Honor, would you like me to come

22  to the podium or stay seated here?

23          THE COURT:  Your choice.  Either, I think, is equally

24  safe, if you will, with the screen, so...

25          MR. PHILLIPS:  Okay.  If it's okay with the Court,
```

1  then I'll stay here.

2          THE COURT:  Yes.

3          MR. PHILLIPS:  Your Honor, just a tiny bit of

4  background about this case.  A second superseding indictment

5  was returned, which charges Defendant Fayne, also known as

6  Arkansas Mo, as well as three other people with conspiracy to

7  commit wire fraud.  They were also charged with individual

8  counts of wire fraud.  And Mr. Fayne and one other defendant

9  were charged with bank fraud.

10         And Defendant Fayne was charged with making a false

11  statement to a financial institution and he was charged with

12  concealment money laundering, transactional money laundering

13  and aggravated identity theft.

14         And the second superseding indictment also includes a

15  very significant forfeiture provision, which seeks to forfeit a

16  lot of property that was obtained with the illegal proceeds of

17  the bank fraud.

18         And the indictment alleges that the defendant and his

19  co-conspirators participated in a Ponzi scheme, which defrauded

20  more than 20 people out of more than $5 million.  And the

21  defendant had a lot of personal spending habits that caused

22  that money to be dissipated, including more than $5 million

23  that was paid to a casino in Oklahoma.

24         On May 13th of this year, the defendant had a bond

25  hearing before this Court on the original indictment.  And at

1  that -- at that time, this Court told the defendant, and I

2  quote:  You're to avoid all contact, directly or indirectly,

3  with anyone who you have reason to believe would be a victim or

4  potential witness in this case.

5          And that's one of the conditions that's set forth in

6  18 U.S.C. Section 3142(c)(1)(B)(5), avoid all contact with an

7  alleged victim of the crime and with a potential witness who

8  may testify concerning the offense.

9          The Court went on to say:  And I encourage the

10  government to give Ms. Miller, who was then the defendant's

11  attorney, a list of potential witnesses or participants to put

12  Mr. Fayne on as much notice as possible.  But the Court said

13  however if they fail to do that, that's not an excuse.  If

14  there's someone who it is later proven that you knew or very

15  well should have known was a potential witness, meaning anyone

16  who has firsthand knowledge of the facts of this case, you're

17  not to speak to that person about this case yourself or through

18  any intermediaries other than your lawyer or investigators

19  working for your lawyer.

20          And as the Court noted, the defendant has chosen to

21  represent himself so he doesn't have a lawyer.

22          One of the victims in the case, as far as the

23  Ponzi scheme part of it is concerned, the wire fraud, is a

24  woman named Jimia Cain, J-I-M-I-A, last name Cain, C-A-I-N.

25          And so the petition for revocation of the pretrial

release in this case alleges that on November the 9th, just a
little bit more than a month ago, Jimia Cain received a text
message from Fayne telling her to dismiss her case against
Fayne.  Because she filed a civil lawsuit against him trying to
recover the money that she lost as a victim in the
Ponzi scheme, which is part of this indictment.

And she's represented by a lawyer named
Seth Rosenberg and the defendant also emailed Mr. Rosenberg and
made misleading and other statements to him.  And so let me
start with the communications between Mr. Fayne and Ms. Cain.

So she was interviewed, that is Ms. Cain, was
interviewed by the case agents in this case.  And she stated
that in May of this year, two thugs, that's her description,
showed up at her house to scare her and try to intimidate her
with respect to her claim against Defendant Fayne.

She then reached out to the middleman who had
recruited her to participate in this Ponzi scheme and tried to
work out a settlement because she was scared because these
people had approached her and threatened her.  She was never
paid any money and shortly after that, Defendant Fayne was
arrested, so she's never gotten back that money.  That was May
of 2020.

Fast forward to November of 2020, sometime during the
week of November 2nd, the defendant texted Ms. Cain and told
her to leave Karlie Redd alone.  Karlie Redd is the defendant's

1  ex-wife and received a lot of the fraud proceeds in this case.

2          The defendant -- I'm sorry, Ms. Cain replied to the

3  defendant's text and said:  I will do everything in my power to

4  help them put you in jail because what you did was wrong.

5          The defendant replied:  Ha ha.  I won't spend a day

6  in jail.

7          About a week later, on November the 9th, the

8  defendant again texted Ms. Cain and made the following

9  comments:  First, he threatened to file a lawsuit against her

10 for harassment and trespassing and hot checks.  And he said,

11 quote:  I have warned you of the trespass you-all are doing.

12 You don't scare me.  I'm private trust property.

13         He went on to say:  Y'all will pay very soon.  You

14 can't sue private property, private private property.  Good

15 luck and trust all courts with see my IPP status.

16         And to explain a little bit about what that means, we

17 can look at the email that the defendant sent later that day to

18 Seth Rosenberg, and he's the attorney for Jimia Cain, and the

19 defendant stated:  Trust law.  As I stated to you client,

20 Jimia Cain, you-all are trying to administrate against private

21 trust property, which is illegal and considered trespassing.  I

22 have attached to you a copy of notice of surrender achieving

23 IPP status.  My duty is the warn you of status, and hope

24 you-all do the proper thing, close and dismiss immediately,

25 with exclamation points.  This is a 72-hour notice.  Please

1 | forward all dismissal documents within 72s hours before the
2 | suit of trespass is given.  Trust law, all rights reserved.
3 |         And then the defendant attached to that a document
4 | that I probably should just give to the Court rather than read
5 | the whole thing.  I'm going to mark this as Government's
6 | Exhibit 1.
7 |         THE COURT:  Well, does Mr. Fayne have a copy?
8 |         MR. PHILLIPS:  I'm going to provide him one,
9 | Your Honor.
10 |        Your Honor, the document that I marked as
11 | Government's Exhibit 1 is that email that I just read from the
12 | defendant.
13 |        And then attached to that is this document that says
14 | the Chair of Saint Peter Foundation, notice of surrender
15 | documents for Maurice Johnson Fayne, and it has a table of
16 | contents.
17 |        And so the Court can see from looking through that
18 | that this is part of the defendant's litigation strategy in
19 | this case, which has been called by courts the sovereign
20 | citizen litigation strategy, so the defendant thinks this is --
21 | excuse me -- a get-out-of-jail-free card, and this prevents him
22 | from being prosecuted or prevent him -- prevents him from
23 | having any legal liability for the things that are alleged in
24 | the indictment.
25 |        Ms. Cain told the case agents when she was

1 interviewed that she felt like she was being threatened by the

2 defendant.  And so we have asked the Court to revoke the

3 defendant's bond.  We think that this is clear and convincing

4 evidence that the defendant has violated his conditions of

5 pretrial release, specifically the one that I mentioned earlier

6 about not having contact with an alleged victim or with a

7 potential witness who may testify concerning the offense.  And

8 as stated, the Court directly instructed the defendant not to

9 have contact with any witnesses or victims.

10          And I'm willing to hand the Court a copy of the

11 transcript of the bond hearing.  And I'll give a copy to

12 Mr. Fayne as well.

13          THE COURT:  Thank you.

14          MR. PHILLIPS:  And the part, Your Honor, that I read,

15 the quote from the Court begins at the bottom of Page 23 and

16 continues on to 24.

17          THE COURT:  All right.  Is that it from the

18 government?

19          MR. PHILLIPS:  No, Your Honor.

20          THE COURT:  Okay.

21          MR. PHILLIPS:  Just briefly, I'd just like to address

22 the statute.  18 U.S.C. Section 3148 talks about sanctions for

23 violation of a condition of release and states that if -- the

24 judicial officer shall enter an order of revocation and

25 detention if after a hearing it finds that there is clear and

1  convincing evidence that the person has violated any condition

2  of release, so we've produced the emails and the -- I have the

3  text messages -- excuse me -- as well.

4        And I will hand those over to Mr. Fayne and to the

5  Court.  They're front and the back, both sides.  Those are the

6  text messages.  So we believe that the evidence is clear and

7  convincing that the defendant did communicate with a potential

8  witness concerning the subject matter of this litigation, this

9  indictment.

10        And then it states that if the Court finds, based on

11  the factors set forth in Section 3142(g), that there is --

12  excuse me -- it's hard to talk in this mask -- no condition or

13  combination of conditions of release that will assure the

14  person will not pose a danger to the safety of the community or

15  to any other person or that the person is unlikely to abide by

16  any condition or combination of conditions of release, that

17  that person should be detained.

18        And the factors that the Court should consider under

19  3142(g) include the nature and the circumstances of the offense

20  charged, and so I pointed out to the Court the seriousness of

21  these allegations, including various types of fraud, money

22  laundering and aggravated identity theft and conspiracy.

23        If convicted on those charges, the defendant would

24  certainly be facing more than ten years in a federal

25  penitentiary.  The weight against -- the weight of the evidence

1   against the defendant is overwhelming.  The bank records, the

2   text messages, the emails, the other business records, records

3   maintained by government agencies, including the Department of

4   Transportation, the Federal Motor Carrier Safety Administration

5   all show that the defendant committed the acts alleged in the

6   indictment.

7           The text messages and emails from the defendant to

8   co-conspirators concerning the Ponzi scheme and the bank fraud

9   to obtain PPP money under false pretenses, it -- it's going to

10  be uncontested.  There is no doubt that the defendant authored

11  those communications and obtained the money and obtained the

12  benefit of the money.

13          The next factor is the history and characteristics of

14  the person.  And as I said, the defendant has adopted this

15  pro se sovereign citizen litigation strategy.  As the Court

16  knows, firsthand, he has refused to plead not guilty when

17  requested to do so at his arraignment on the three indictments

18  in this case.  The defendant has repeatedly badgered this Court

19  about easing his travel restrictions, allowing him to go to

20  Arkansas.

21          One of the defendants, unindicted co-conspirators,

22  who participated in the Ponzi scheme and other aspects of the

23  fraud, including the aggregated identity -- identity theft, who

24  manufactured fraudulent documents and fraudulent

25  identifications and filed fraudulent documents for the

1 defendant with various government agencies is a woman named

2 Ganell Tubbs that the defendant calls Aunt G., she lives in

3 Arkansas.  She was a big part of his fraudulent business.  She

4 has been indicted in Arkansas on her own PPP fraud, multiple

5 million-dollar-fraud.  And it's my understanding that she is

6 going to plead guilty to those charges very soon.

7          The defendant was recently charged with aggravated

8 identity theft.  He stole the identity of a person, Duron

9 Porter and then had a fake ID, fake Georgia driver's license

10 with a fake Social Security card manufactured in the name of

11 Duron Porter.  He used that to obtain credit and to obtain

12 money.

13          There are various communications going back and forth

14 by email and text between the defendant and the person who

15 manufactured or brokered the manufacture of the fraudulent

16 documents for him.  We have that entire conversation on text.

17 We have emails going back and forth between the defendant and

18 Aunt G. in Arkansas, directing her to use the fraudulent ID in

19 the name of Duron Porter.

20          The defendant also posed repeatedly throughout the

21 Ponzi scheme, which went on from 2014 through the time the

22 defendant was arrested in 2020, he posed as a person who worked

23 for Walmart whose name was Marty Blackston.  The defendant

24 alleged that Marty Blackston, who is a real person, who

25 actually works for Walmart, who has a high-level executive job,

1  I want to say director of safety or compliance or something

2  like that, the defendant posed as him in various telephone

3  conversations and texts with victims.

4          He also pretended to be a person named Terrence

5  Miller, who was another employee of Walmart.  He has filed

6  fraudulent --

7          THE COURT:  Let me ask you this question, because I'm

8  trying to put the chronology together.  You've been referring

9  to the Ponzi scheme, which is in the second superseding

10  indictment, right?

11          MR. PHILLIPS:  It's in the second superseding

12  indictment.  It's also in the original indictment and the

13  middle indictment, if you will.  It was alleged as a wire fraud

14  scheme from the very beginning.

15          The difference is that various other people have been

16  added to those charges.  Originally the only person who was

17  charged with wire fraud was the defendant, Maurice Fayne, then

18  we added, later on, Dan Jay, Mike Sargent and Mark Sargent, but

19  they were -- they were referred to by their initials in the

20  original indictment as various middlemen who worked with the

21  defendant and assisted him in the fraudulent wire scheme,

22  Ponzi scheme.

23          THE COURT:  Okay.  All right.  Thank you.  I wasn't

24  sure if we were talking about charges that were in the first

25  superseding indictment.

```
 1            MR. PHILLIPS:  We are, Your Honor.  We just fleshed

 2    that out.  The defendant has always been charged with that.

 3    The most recent indictment added a conspiracy charge, but there

 4    was always a scheme to defraud under the wire fraud statute,

 5    which referred to the same conduct.  And so now we've charged

 6    it as both conspiracy and various individual counts of wire

 7    fraud.

 8            THE COURT:  Okay.

 9            MR. PHILLIPS:  So in addition to those people that

10    the defendant posed as, Duron Porter, Marty Blackston,

11    Terrence Miller, he's also posed as Princeton Cunningham and

12    Donovan Whittington in various filings that he fraudulently

13    caused Aunt G. to make to the Federal Motor Carrier Safety

14    Administration and the Department of Transportation and others.

15    And so the defendant, for example, has tried to cover his

16    tracks and tried to absolve himself of --

17            THE COURT:  I'm going to let you speak in a minute.

18            MR. PHILLIPS:  -- any liability with respect to

19    various trucking companies that he created in Arkansas, for

20    example, by taking his name off of the public records and

21    replacing his name with these fraudulent identities of

22    Donovan Whittington and Princeton Cunningham, so the defendant

23    has a history, a long history, of posing as other people.

24            The Court instructed him clearly, don't have any

25    contact with witnesses or victims.  He ignored that.  And so I
```

1  know one of the questions the Court will have will be instead

2  of detaining this person, is there some other condition that we

3  can impose on him that would keep the victims and the witnesses

4  safe and that would cause him to abide by the Court's

5  instructions.

6        And so I think the answer to that is no.  And the

7  reason I say that is if the Court were to, for example, impose

8  some sort of restrictions on the defendant's use of electronic

9  devices, his smartphone, his tablet, his laptop, the defendant

10  could easily comply with those conditions on -- it's like

11  keeping a second set of books.  He would have one set of phones

12  and tablets and computers that he could show to probation when

13  they come to check him and it's going to show that he complied

14  with the Court's orders, but the defendant has lots of money

15  hidden.  He lives a very luxurious lifestyle.  He's got plenty

16  of money to go buy a new iPhone, a new computer, a new laptop,

17  a new tablet, whatever, and keep a second set of books, if you

18  will.

19        So there's no way that the probation officer can

20  enforce that restriction, and so the victims and the witnesses

21  are at their peril.  And this is a defendant who has a lengthy

22  history of posing as other people, of trying to intimidate

23  witnesses, of engaging in these shenanigans through this

24  sovereign citizen litigation strategy.  He is not complying

25  with the instructions of this Court.  He has no respect for

1  this Court or for this Court's rules and regulations.  He won't

2  even plead not guilty when asked to do so.

3          So we believe that there is no set of conditions that

4  could ensure the safety of the community if this defendant is

5  released and we ask the Court to detain him.  Thank you.

6          THE COURT:  Mr. Fayne?

7          THE DEFENDANT:  First, Your Honor, I guess I will

8  start with the reason why I was supposed to be here with the

9  Jimia Cain situation.  If you go to the court document -- which

10 one is this -- the original hearing, he said that it would be

11 victims and particular witnesses in this case.

12          Jimia Cain has a total separate civil case that she's

13 suing my ex-wife, myself and a former company that I owned.

14 All of the text messages are not here.  She actually reached

15 out to me first.  There was just one day of communication, not

16 this -- this was in May.  This happened in November, I believe.

17 I'm not really sure of the exact date, because I can't even say

18 this is exactly what it is that -- it reads familiar, but I

19 can't say it's exactly what it is.  And my only conversations

20 with Ms. Jimia Cain had nothing to do with this case

21 whatsoever, not one single word, conversation.  It was strictly

22 on a civil case that we have in the State of Washington.

23          THE COURT:  Is she not a potential witness in this

24 case, in the Ponzi scheme?

25          THE DEFENDANT:  That -- I didn't -- that I knew of,

1  no, sir.  No, sir.  We had a separate total civil matter going

2  on in Washington prior to this indictment even happening.

3          And so when she -- she reached out to me,

4  mentioning -- I don't see it here, I see stuff has been -- you

5  know, not -- I see the government is not being thorough with

6  this full text message thread, but her original text to me, I

7  believe, I don't have it in front of me because, I don't -- I

8  don't have my cellphone, but her original text to me was she --

9  she's -- she's willing to work with I believe it was Agent

10  Sarah -- Sarah Oliver or something, I'm not -- I'm not really

11  sure.  Don't quote me on that, Your Honor, because I don't have

12  it in front of me.

13          But I know that this is not the full text string

14  because she actually reached out to me first.  I didn't reach

15  out to her.  I didn't -- I didn't wake up one day and say, hey,

16  I'm going to contact Ms. Jimia Cain.  She actually contacted

17  me.

18          And then as far as the other set of communications,

19  that was to her attorney, and that was in reference to the

20  civil case, not nothing to do with this indictment in any form

21  or fashion, but an attorney of hers who she gave me the

22  information for.

23          Now, the government has sat here and said numerous

24  things, false allegations of things that I have done or

25  supposedly done.  I can assure this Court I respect this Court.

1    Ever since the original release in May, I have not violated any

2    bond conditions.

3          I have -- everything they have told me, my probation

4    officer, Mr. Tudor gave me a list of people that I do not need

5    to contact, and I have followed their list thoroughly.  I have

6    not contacted not one single person on that list, not one

7    single time.  Anything that Mr. Tudor has asked me to do, to

8    call, be present, whether it's a court hearing, I have done it.

9          The arrest from yesterday, he called me last week

10   asking me to come in for my routine -- monthly routine.  I came

11   in.  We set a time at 12:00.  I was there at 12:00 yesterday.

12   And then that's when this arrest happened for this supposed

13   communication.

14         I have not had one single conversation with anyone

15   regarding this case, a potential witness or potential -- that

16   have anything to do with this case whatsoever, not -- not

17   anything.

18         That's why if you -- these text messages, it's about

19   a legal suit, she's not -- she's not suing me with this

20   indictment.  This is not her versus me or anything.  It has

21   nothing to do with this court case whatsoever.

22         THE COURT:  Well, what does it have to do with,

23   what's the --

24         THE DEFENDANT:  Two things, Jimia Cain, she had a

25   crush on me.  She was a lady that was trying to be intimate

1  with me.  I was not interested at the time.  I was separated

2  from my wife.  She actually helped me with a few business

3  things while my wife and I were separated.

4         Then me and my wife reconciled at that point in time

5  earlier this year, at some point, I don't know the exact date

6  but during -- right around -- I believe -- maybe January or

7  February of this year.  And ever since then, she's been on a

8  witch hunt.  She's contacted TMZ, she does stuff all on social

9  media trying to get different attention.

10        And so all of my responses to her -- the whole thing

11 with my response to her was just telling her to leave my

12 ex-wife out of this.  She has nothing to do with any of the

13 lawsuit she's trying to claim.

14        She actually sent me two 50 -- two $25,000 fraudulent

15 checks, she actually deposited them in my bank account.  And

16 that's why I mentioned about -- so she's saying I owe her

17 money, but she actually deposited two 20 -- two $50,000 bad

18 checks into my bank account at some point last year, in 2019.

19 I don't know the exact dates.

20        Like I said, I'm -- I'm here.  I don't know where

21 Mr. -- my standby counsel, Mr. Jeffrey, but I don't have all of

22 that to go with the exact dates and times and stamps, but I can

23 assure this Court I'm not threatening anyone.

24        He mentioned something about some thugs came to her

25 home or something.  First and foremost, in her civil suit that

1  she's doing in Washington, she said that my wife sent people to

2  her house, not me.  And me and my ex-wife was separated at that

3  time, if I could leave the Court -- like I said, if I had the

4  opportunity to have all of my information present, I could give

5  that to the Court, that there's been an ongoing thing for about

6  a year, a year and a half now.  It has nothing to do with this

7  case whatsoever.

8          Now, I'm sure once everything that went out in the

9  media happened, she was going to try to jump on board now with

10 it, you know, that just has been her demeanor throughout this

11 whole process.

12         He mentioned Princeton Cunningham

13 and Donovan Whittington.  Donovan Whittington, he is my nephew,

14 which actually had his own trucking company.  Same thing with

15 Princeton Cunningham.  These are not people that I allegedly

16 acted as other people.

17         I'm myself.  People know my voice.  I can't disguise

18 my voice.  I'm on television, or was on television, so it's not

19 like I could walk into a room and say, Hey, I'm Tim Turner and

20 somebody will go, like, no, you're -- you know, you're Maurice

21 Johnson Fayne or you're Arkansas No or you're this, because

22 they know -- you know, they've done seen my face, they've

23 done -- with the social media, whatever.

24         But back to this original thing here, the list that

25 Mr. Tudor gave me of people to don't contact, I have not had

1  any communication with.  Now, I understand that -- this fine

2  print, that if you don't -- if the Court failed to show me, you

3  know, a person, that's not an excuse.  Well, this lady has

4  nothing to do with this case whatsoever, not one single thing.

5          This is a total separate civil matter in the State of

6  Washington.  It has nothing to do with the PPP loan, it has

7  nothing to do with -- all our responses are simply about her

8  trying to sue -- well, I believe she actually have sued myself

9  and my ex-wife.  I haven't received those physical -- all of

10 those physical documents, but --

11         THE COURT:  And do the allegations of that case have

12 anything to do with investing in your trucking company?

13         THE DEFENDANT:  Well, that's the thing, she invested

14 in me -- she loaned -- well, not even loaned me money, she more

15 so --

16         THE COURT:  And I'm trying to be careful here for

17 your benefit, because don't forget -- I mean, you know, you

18 have the right to remain silent, and I don't want you speaking

19 about the facts of your case, so I worded it about the

20 allegations --

21         (Multiple voices overlapping)

22         THE DEFENDANT:  Yeah, I don't want to -- I don't want

23 to get into the merits, but she gave --

24         (Multiple voices overlapping)

25         THE COURT:  Are the allegations involved in the

1  lawsuit --

2       THE DEFENDANT:  But she deposited two $50,000

3  fraudulent checks into my bank account.

4       THE COURT:  And does her allegation in the Washington

5  case, or in any case she's made against you, involve her

6  investing in your trucking company?

7       THE DEFENDANT:  Alleging, but with --

8       THE COURT:  Right.

9       THE DEFENDANT:  -- fraudulent checks, allegedly.

10      THE COURT:  So she alleges that she invested in your

11  company.  You're saying those were with fraudulent checks?

12      THE DEFENDANT:  Fraudulent checks, like, a year and

13  20 -- I can't -- I don't want to go on record saying the exact

14  date, because then if I say May and it was actually June, then,

15  you know, that could come back and hurt me.  But I think this

16  whole ordeal right now with the government trying to revoke my

17  bond --

18      THE COURT:  Well, let me ask this, though, why does

19  that have nothing to do with this case when the indictment --

20      THE DEFENDANT:  The original indictment --

21      (Multiple voices overlapping) --

22      THE COURT:  -- this so-called --

23      THE DEFENDANT:  -- had nothing to do with --

24      THE COURT:  We're talking about the first superseding

25  indictment, which was the one that was in place during these

1  communications.

2          THE DEFENDANT:  The indictment -- I don't have --

3          THE COURT:  And the wire fraud scheme involved

4  soliciting investors --

5          THE DEFENDANT:  She wasn't --

6          (Multiple voices overlapping)

7          THE COURT:  -- to pay for your trucking company.

8          THE DEFENDANT:  Her name --

9          THE COURT:  Remember, I'm not asking you to tell me

10 facts about the case.

11         THE DEFENDANT:  Her name wasn't listed --

12         (Multiple voices overlapping)

13         THE COURT:  It was not listed, but --

14         THE DEFENDANT:  But it was other people's names that

15 I issued -- quote/unquote, allegedly done business with that

16 were listed.  Her name was not listed.

17         I actually got a new list from Mr. Tudor, because if

18 something came up with the bank, I wanted to contact the bank,

19 and then he actually sent -- it was a -- I can't remember

20 exactly who it was that I -- I wasn't aware was one of the

21 people that I shouldn't contact, and it was brought to my

22 attention and we immediately corrected it.

23         But I can assure this Court I'm not harassing

24 anybody.  I have never threatened anybody.  I have not -- I

25 have abided by every single condition that has been given under

1  every single circumstance possible.

2          My travel, whereabouts, everything, I communicate

3  properly with -- with my probation service guy.  I believe --

4  and this is just my opinion -- but I believe that the

5  government is here right now because the government has been

6  unethical with a lot of the things they put in discovery.  I

7  brought it to their attention.  I have been sending several

8  emails to him about that, even when we just had our last

9  hearing in court with you, you said you don't do anything about

10  the pretrial motions and stuff.

11          But I believe all of this is just a form of

12  retaliation, because he's known they have been unethical.  He

13  sent me an email telling me what they had done wrong and how

14  they was going to correct it, and so I believe that this whole

15  thing is a charade or retaliation or punishment to keep me from

16  being able to properly defend myself in this case.

17          As well as Mr. Phillips talking about the time he

18  continues to send things to my standby counsel that should

19  actually be sent to me directly, because my standby counsel

20  can't make any decisions or choices.  He's constantly sending

21  him documents or let your client know this or that when he's

22  not my attorney.

23          I don't have a problem personally or anything with

24  Mr. Phillips or anything, but I think this whole revoked bond

25  and all of this is just a charade.  I have not -- there's no --

1  nothing in the world that I have threatened any single body

2  about nothing regarding this case.

3        And had I known Ms. Cain was going to be a part of

4  the government's strategy with all of this, I would have -- I

5  wouldn't have responded to her.  I didn't reach out to her, she

6  reached out to me, so I don't know if that's something that her

7  and the government got together and done and said, okay, send

8  him a message, let's see if he responds.  Another,

9  quote/unquote, trap, just like the trap that they got me with

10 yesterday, when there's an arrest warrant been out there, when

11 all they had to do was tell me, hey, you've got an arrest

12 warrant, I would have appeared.

13        But it was supposed to have been my pretrial

14 weekly -- monthly thing, and they didn't do any of that, but

15 just, you know, sat there and waited to get an arrest warrant

16 and I have yet to even see the arrest warrant.  I don't know

17 who signed off on it.  I was under the impression that the

18 government would let me know.

19        Like I said, when this form here came, I had an

20 attorney, so I don't know how all that different stuff works,

21 but I was under the impression of my own that if anybody that I

22 wasn't supposed to contact, whether the government themselves

23 would tell me or that's the reason why I got a pretrial service

24 officer, so if there are any changes in my case, that it would

25 be brought to my attention.  Unfortunately, Ms. Miller hasn't

1  been a part of anything since May.

2          THE COURT:  All right.

3          MR. PHILLIPS:  May I respond just briefly,

4  Your Honor?

5          THE COURT:  Yes.

6          MR. PHILLIPS:  I talked to Jimia Cain's attorney

7  yesterday, Mr. Rosenberg.  He told me that the actual amount

8  that Ms. Cain invested in the defendant's trucking business is

9  approximately $700,000.

10          THE DEFENDANT:  What?  Hearsay objection.  Hearsay.

11  Hearsay.  No way possible.  That is -- that's again -- the

12  government is exaggerating again.  It's -- as well as --

13          THE COURT:  Mr. Fayne, I mean, I'm going to overrule

14  the hearsay objection, because hearsay doesn't apply in a

15  proceeding such as this.  You've also proffered out of court

16  statements as well.  I'm allowed to consider information

17  proffered by the parties.  Now, what weight I apply to any

18  statement is a different question, but your objections to

19  hearsay, I'm going to overrule that.

20          MR. PHILLIPS:  Thank you, Your Honor.

21          So that's the amount that he told me, it was

22  approximately $700,000.  In addition, having reviewed a lot of

23  the defendant's bank records and records that Jimia Cain and

24  her attorney provided to the case agents in the investigation,

25  it's my recollection that those documents show hundreds of

1  thousands of dollars that Ms. Cain invested in Defendant

2  Fayne's trucking business, not limited to the two $50,000

3  checks that the defendant says she gave him which bounced.

4  There's a lot more than that.

5          And all of the money that she gave to the defendant

6  was for the purpose of investing in the same trucking company

7  that's referred to in the indictment from day one of the

8  indictment.  That is the wire fraud scheme, sometimes referred

9  to as a Ponzi scheme, that's described in the indictment.  She

10  is one of those victims.

11          And so if the defendant, you know, says she's not on

12  the list that was originally provided to him, that is true,

13  because at the time we didn't know about her.  But our

14  investigation was ongoing, and we continued to find more

15  victims and more witnesses.

16          And we provided discovery, including all of the 302s

17  and all of the MOIs.  We didn't hold any of that back.  We sent

18  the discovery by Federal Express to the defendant's residence

19  in Dacula.  The defendant rejected that discovery and sent it

20  back to the United States Attorney's Office by Federal Express.

21          So he chose not to receive that discovery, and

22  Judge Larkins warned him when he was telling him how dangerous

23  it was to proceed pro se, that he was going to be responsible

24  for all communications with the Court, all official notices and

25  everything else.

1             The defendant wanted to have us ship all of his

2    discovery and all official court documents to some post office

3    box in Oklahoma City, and we objected to that and told the

4    Court that that would just create more delay, and that there

5    was no reason to do that.  The defendant needed to provide an

6    address in Georgia.  And so the defendant did that.

7             All of the communications that we have with him, that

8    we send out in writing, go to that address that the defendant

9    provided and we copy Mark Jeffrey, who is the defendant's

10   standby counsel.

11            I think that the things the defendant was referring

12   to earlier that he says went to Mr. Jeffrey and not him were

13   communications concerning the ongoing forfeiture claim in this

14   case.

15            And so Mike Brown's forfeiture section in our office

16   sent various notices to the defendant and to Mr. Jeffrey,

17   concerning the forfeiture aspect of the case, but the defendant

18   was copied on that.  We haven't left him out of any of that.

19            And so even though Jimia Cain was not on that

20   original list, who better than the defendant himself to know

21   who he took money from?  If you took hundreds of thousands of

22   dollars from a person, including what you claim were two bad

23   checks for $50,000, you know that person.

24            I mean, let's face it, they've talked.  You don't get

25   that kind of money from somebody, you know, just having met

1  them for 15 seconds.  They had an ongoing relationship.  He

2  knows full well who she is.  He knows exactly what her

3  situation is, what her status is.  And he knew that she was an

4  investor in the same trucking company and the same alleged

5  fraudulent scheme described in the indictment.  He knew that

6  when he communicated with her.

7          And if you look at his communications with her and

8  with her lawyer, it's clear that he is trying to use his status

9  as a sovereign citizen to get out of paying her money related

10 to the same claim that's alleged in the indictment.

11         That's all I have, Your Honor.  Thank you.

12         THE COURT:  Just -- just briefly, sir.

13         THE DEFENDANT:  Okay.  First and foremost, this

14 sovereign citizen stuff he's speaking of, that's an oxymoron to

15 me.  I'm not sure of what a sovereign citizen is or anything

16 like that.

17         My -- myself with her, strictly with her, is trust, I

18 have a trust, I have a trust set up that has been registered

19 with the United States, it has been registered in my county, it

20 has been registered completely everywhere, and I was just

21 letting her know, because she's suing me personally, as well as

22 my ex-wife personally.  She's suing us, individuals, not

23 business, she's -- she's coming after us as individuals.

24         And my whole communication with her was simply my

25 ex-wife has nothing to do with anything that you and I had

1  going on.  That's it.  It was nothing about -- nothing else,

2  Your Honor.  And that's the honest to God truth.

3         It had nothing to do with nothing other than me and

4  my ex-wife -- she has nothing to do with any of this.  I wasn't

5  trying to -- I wasn't harassing anybody, I wasn't -- nothing.

6  I was just letting -- I was a part of every -- a part of what I

7  have read and has been talked about the private trust and

8  property, you have to let people know, and you have to put them

9  on notice so they know.

10        Same thing I did with the courtroom, when he's

11  speaking of discovery, yes, I sent back a package because after

12  I had gave the Court an address where I would receive my mail,

13  I didn't know it came from the Court.  It was just FedEx.  So

14  the FedEx, I had a note on my door to return all packages back,

15  no matter whether it was FedEx, UPS, didn't know who it was,

16  because at that point in time, everything was so fresh, I was

17  getting hate mail and that type of stuff.

18        And so certain -- I just wasn't opening any mail at

19  my physical address, so I had a third party receiving all my

20  mail so it could be scanned and copied and that way I know I've

21  got every single document.

22        So I did get the discovery that he's talking about,

23  however, I haven't got the bulk of the discovery, and this is

24  something that we're going to have to address with Judge Anand

25  is -- well, you're Judge Anand.  Sorry about that.

1          THE COURT:  That's all right.  I understood.

2          THE DEFENDANT:  With the other Judge, because he went

3    on record saying, hey, we need a hard drive.  I gave him a hard

4    drive.  Now he wants a USB.  That's not -- if we go to the

5    transcript, that's not -- the transcript didn't say I want a

6    USB, it said a hard drive, and I provided him with a hard

7    drive.

8          And to this day, I have yet to receive the discovery,

9    because he's saying that the government don't have the

10   ability -- now, the United States government don't have the

11   ability to put the discovery on the hard drive that I -- I

12   provided to them, which is exactly what he asked for.

13         Now, he meant to say he want the USB, two terabyte,

14   but that's not what he said, so I got what he said.

15         So as far as some type of discovery that I should

16   know this and I should know that, this is simple, Your Honor,

17   if I had've known, just like any other list or anything else he

18   has told me, I have not had any involvement in any form or

19   fashion with not one single person that they have told me not

20   to contact, communicate with or in any form -- I mean, in any

21   form or fashion, not one single person.

22         THE COURT:  All right.  All right.  So I find -- I do

23   find the defendant has violated his conditions of release.  The

24   conditions stated that the defendant was not to have contact

25   directly or indirectly with anyone who would be a potential

1  witness in the case.  And I was very clear.  I was extremely

2  clear.  Mr. Phillips read it here this morning.  I didn't need

3  him to, because it's what I say in every case, but I was very

4  clear as to what I meant by that.

5           I meant -- I encouraged the government to give you a

6  list, but I was very clear that that list was not the complete

7  list of the folks you were supposed to avoid.

8           It was to give you, as much as they could, a list,

9  but I also made very clear it was to include anyone else,

10  whether listed or not, whether named in the indictment or

11  listed by the government in this list or not, that you knew

12  were potential victims or participants or had knowledge,

13  firsthand knowledge, about the facts of the case.

14           So you focused this morning on it wasn't on the list,

15  I wasn't told, so if I wasn't told not to talk to them, then I

16  could talk to them.  That's not the order that -- or the

17  condition of release that was in place.  It didn't work that

18  way.  And I could not have been clearer.

19           I know you had a lawyer then, but you chose not to

20  have a lawyer.  And both Judge Larkins and I have gone over

21  that with you multiple times, that that was a bad choice.

22           You were there, though, to hear it.  And what I said

23  wasn't legalese, it was crystal clear, you are not to speak to

24  anyone directly or indirectly about this case that's a

25  potential victim or witness, and that was not limited to the

1    people they gave you a list of.

2              So then the question is, is this person, Ms. Cain, a

3    potential victim or witness, and I believe she is, that that's

4    been established here, that you don't -- that her -- yes, the

5    communications that have been provided are -- appears to be in

6    the context of the private case, but the private case, as far

7    as I understand here, are allegations of a victim in a private

8    civil case that mirror the claims in this criminal case.

9              In other words, what she is alleging in the civil

10   case is that she was lied to in giving or investing money and

11   that may be overlap between the civil claim that she's bringing

12   and the allegations and her role in this criminal case that

13   is -- that is the subject matter of the first superseding

14   indictment, which was the indictment that was in place at the

15   time of these communications.

16             So the specific wording in the back-and-forth is

17   about the civil case.  Drop the case, you know, counter

18   lawsuit, those are references to a civil process, I understand

19   that.

20             But they are also referring to the claims that this

21   person has been making.  She even makes this direct reference

22   to wanting to be part of an effort to put you away, so she's --

23   she's clearly referring to this as more than just about a civil

24   claim.

25             But in any event, the statements are broader than

1 just about the civil case.  They're saying you've made false

2 statements, false claims, you are harassing me, and all of that

3 to a witness about the subject matter of the information that

4 she may be a witness about in the criminal case, that is

5 exactly 100 percent what was -- what you were ordered not to

6 do.

7          And I can't find that you weren't on notice that this

8 was a potential witness, because from what I'm hearing, the

9 subject matter of her claims is exactly the subject matter of

10 the fraud scheme that's in the complaint.  She's even

11 referencing being a part of the group that's going to put you

12 away, so she's clearly referencing that she's involved in

13 criminal matters against you.

14          But that the government didn't give the name to you

15 is -- I could not have been clearer -- not the excuse, it just

16 makes it where we have a harder burden for the government to

17 show that you should have been on notice that this person was a

18 witness.  It puts you on better notice if they gave you the

19 name.  I always -- it's better for them to give all the names

20 they can.

21          But I couldn't have been clearer that wasn't going to

22 be enough or -- in other words, that the provision of the name

23 was not a requirement of -- for there to be a bond violation,

24 because whether you got the name or not, if it was someone who

25 you had reason to believe was a witness, a potential witness in

1  the criminal case, and for all of the reasons I've said before,

2  I believe that that's been established here.

3          Now, the -- I want to -- there are no overt threats

4  of violence, certainly, and I'm not -- I'm trying not to

5  overstate this here, this is talking about countersuit and

6  trespass and legal terms, but where you have a criminal

7  defendant who is making threatening statements, even if they're

8  threatening legal recourse, that can have a chilling effect on

9  witnesses and witnesses might reasonably not take it as limited

10  to a legal threat.

11          And here, the language that's used, there are some

12  ambiguities, this is a 17 -- a 72-hour notice.  Now, the

13  defendant may have a belief that that means something under the

14  legal theories that he's operating under, personal property and

15  all that, but I don't know that an ordinary person wouldn't get

16  that and be concerned that that's a threat of some action to be

17  taken within 72 hours.

18          These are the things that even if not necessarily

19  intended as a threat of violence or intimidation could be

20  construed that way reasonably, and that's one of the reasons

21  why there's not to be any contact, direct or indirect, with

22  potential witnesses, so that things that even if construed

23  wrong by the witness don't get turned into a problem.

24          That's why it's prophylactic, to some degree, that

25  the defendant is not to have contact, direct or indirect, with

1  a potential witness in a case.

2          So I believe that that's been established here, that

3  that is what has happened, that there's been a violation of a

4  bond condition, a very important bond condition, one of the

5  foundational bond conditions, to not be engaging in conduct

6  that would potentially corrupt the integrity of the case.

7          The question then is, is revocation and detention

8  necessary or are there other conditions to be applied that

9  could address this or prevent this from going forward.

10          And that is hard for -- I mean, that's -- I cannot

11  identify bond conditions here to address a situation like this,

12  meaning that no bond conditions I can issue would prevent the

13  defendant from communicating with -- with individuals.

14          I mean, nothing I can order can better state what the

15  rules are and if -- and I can't force the defendant to hear or

16  understand those.

17          The defendant likely personally knows many of these

18  folks, because I think Mr. Phillips is right, you don't invest

19  sums of money without some relationship.  And so there's very

20  little I can do to prevent Mr. Fayne from reaching out to folks

21  through social media, through phone, through email.  And even

22  if I were to restrict electronic devices, that's -- electronic

23  devices are ubiquitous and easily obtained in our economy, so

24  there's very little I can do to prevent that.

25          So I really don't see any way for me to avoid

1    revoking your bond, Mr. Fayne.  And this was a hard decision in

2    the first place.  I was -- the government moved to detain you,

3    or, no, I'm sorry, you did not move to detain but, you know,

4    there was a substantial amount of evidence about travel and the

5    money, and it was a very difficult -- it was a very unusual

6    case that was very -- not a cut-and-dried case for fashioning

7    conditions of release.

8            I've not taken offense to any, you know, request to

9    travel or -- I think Mr. Phillips used the sovereign citizen

10   terminology and certainly there are terms that are being used

11   here that -- that are not -- that are legally frivolous,

12   personal property and the like, but I don't take any of that to

13   be, in itself, suggestive of a bond issue, and so I disagree

14   that that's a consideration.

15           But the lack of verifiable, ongoing and concrete

16   employment, the substantial travel was an issue from the

17   beginning, but this -- this is a concern that I just have

18   very -- a lot of difficulty with.

19           The complaint originally involves allegations, I

20   understand the government's case involves allegations and

21   evidence of altered or manufactured financial documents, so,

22   you know, there is an allegation in the case already described

23   in the complaint as to acts of obstruction, manipulating

24   material as part of the evidence in the case, and that's always

25   been a concern of mine.

1              You know, if -- I also recall that this has come up
2    repeatedly.  You asked when you first became representing
3    yourself for permission to contact witnesses.  And you
4    explained, well, if I'm representing myself, I have to be able
5    to contact witnesses.  And I said no.  That was your choice to
6    represent yourself.  It's a bad choice.  And it does not get
7    you out of the bond conditions -- any bond conditions and
8    certainly not the one to not contact witnesses.  So we've
9    discussed this repeatedly over and over again, not to
10   contact -- have any contacts with potential witnesses in the
11   case, so I'm going to -- I'm going to order revocation here and
12   detention of the defendant, but I'll let you have a final word.
13             THE DEFENDANT:  Well, Your Honor, I was just going to
14   say before you ruled that based on what you just said, when I'm
15   told don't do this, don't do that, that's exactly what I don't
16   do.
17             Now, when I had Ms. Miller, I was under the
18   impression that the government would give me a list.  When I
19   had her, she told me to contact the bank about something.  I
20   did.  Then I got an email from -- well, I got a call from
21   Mr. Tudor and said, hey, you weren't supposed to contact the
22   bank.  Then Ms. Miller apologized and then that's when I got
23   the first list of names.
24             THE COURT:  Okay.
25             THE DEFENDANT:  So after I didn't have Ms. Miller

1  anymore, I was under the impression that I would get a list.

2  Now, she's the only person that I --

3          THE COURT:  Well, Mr. Fayne, all I can do is go back

4  to what I told you.

5          THE DEFENDANT:  Yes, sir, and I was --

6          THE COURT:  You were sitting right there.  I was

7  sitting right here.  And I remember this, but it doesn't

8  matter, because we have the transcript.  I told you exactly and

9  in no unclear language --

10          THE DEFENDANT:  Right.

11          THE COURT:  -- that the list -- and maybe I should

12  stop saying anything about a list.

13          THE DEFENDANT:  Right.

14          THE COURT:  I -- I mean that to try to be helpful.

15          THE DEFENDANT:  Yes, sir.

16          THE COURT:  Because where the government can give a

17  list, then it -- then there's no question that you knew.

18          THE DEFENDANT:  Yes.

19          THE COURT:  But I could not have been clearer when I

20  said not getting the list, someone's name on a list, will not

21  be an excuse.  If their name is not in the indictment or you

22  didn't get it on the list does not mean you can contact them.

23          If it's someone who you knew was a victim or had

24  something to do with this case, and I -- I couldn't have said

25  that more clearly, and that's part of the problem here, because

1  in order for me to find bond conditions to be effective, I have

2  to believe you'll comply.

3          THE DEFENDANT:  I am.

4          THE COURT:  So here a basic and clear condition was

5  not even registered.

6          THE DEFENDANT:  Yes, sir.

7          THE COURT:  And that, I -- that was not ambiguous.

8  That was not something that I believe had anything to do with

9  Ms. Miller or anything like that.  I told you clearly myself

10  looking in your eyes that this -- you cannot contact potential

11  victims or witnesses and it does not matter whether they're

12  listed, that does not make it right.

13          THE DEFENDANT:  I understand that, Your Honor.  I

14  just didn't know she was a potential witness or anything.

15          THE COURT:  Well, again, that --

16          THE DEFENDANT:  Because it had nothing to do with

17  this case.

18          THE COURT:  But --

19          (Multiple voices overlapping) --

20          THE DEFENDANT:  Nothing to do with this case,

21  she's -- she's --

22          THE COURT:  -- my understanding, and I asked you

23  directly and you said she --

24          THE DEFENDANT:  She's saying trucking.  I'm telling

25  you that she was into me personally in a -- trying to be in a

1  relationship level.  It had nothing -- she -- this is --

2          THE COURT:  But she's saying trucking.

3          THE DEFENDANT:  Where?  Where?  No -- not on the

4  (indiscernible).  Where?

5          THE COURT:  Is that not in the allegation in the case

6  that she's made?

7          THE DEFENDANT:  In this?  No.  I don't see that.  I

8  don't have that in front of me.  That's what I'm saying.  I

9  don't have that in front of me.

10          THE COURT:  She has not alleged that --

11          THE DEFENDANT:  I haven't seen it.

12          THE COURT:   -- money that she gave.

13          (Multiple voices overlapping)

14          THE DEFENDANT:  I haven't seen her lawsuit.  Now, my

15  ex-wife has.

16          THE COURT:  You have not seen her lawsuit?

17          THE DEFENDANT:  No, sir, I have not.

18          THE COURT:  Then how do you know that it had nothing

19  to do with this case?

20          THE DEFENDANT:  Because my ex-wife -- I'm going off

21  information from my ex-wife, that's why --

22          (Multiple voices overlapping)

23          THE COURT:  I've made my ruling.  I've made my

24  ruling.

25          THE DEFENDANT:  In a text message.

```
1              THE COURT:  And I'm going to order the defendant to
2  be detained pending trial in this matter.  Anything further?
3              MR. PHILLIPS:  No, Your Honor.
4              THE COURT:  All right.  We'll be in recess.
5
6              (Whereupon, the proceedings were adjourned at 1:40
7  p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1               REPORTERS CERTIFICATE

2

3

4          I, Jana B. Colter, Official Court Reporter for the

5    United States District Court for the Northern District of

6    Georgia, with offices at Atlanta, do hereby certify:

7          That I reported on the Stenograph machine the taped

8    proceedings held in open court on December 22, 2020, in the

9    matter of *United States of America v. Maurice Fayne,* Case

10   Number 1:20-MJ-370; that said proceedings in connection with

11   the hearing were reduced to typewritten form by me; and that

12   the foregoing transcript (41 Pages) is a true and accurate

13   record of the proceedings.

14         This the 20th day of January, 2020.

15

16

17

18                              _____

                                /s/ Jana B. Colter, FAPR, RMR, CRR, CRC
19                                    Official Court Reporter

20

21

22

23

24

25