IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | INDICTMENT NUMBER |
| v. | 1:20-CR-228-MHC-JKL-1 |
| MAURICE FAYNE, *a/k/a Arkansas Mo* | (SECOND SUPERSEDING) |

**Government's Response in Opposition to
Defendant Fayne's Motion for Reconsideration of his Detention Order**

A detention hearing may be reopened at any time before trial if the Court finds that

"information exists that was not known to the [defendant] at the time of the hearing and

[the information] has a material bearing on the issue whether there are conditions of

release that will reasonably assure the appearance of [the defendant] as required and the

safety of any other person and the community." 18 U.S.C. § 3142(f)(2). Fayne fails to

satisfy either part—let alone both parts—of this two-part test. The evidence on which

Fayne relies is neither new nor material, so his detention hearing should not be reopened.

*See, e.g., United States v. Saintvil*, No. 1:12-CR-285-03-WSD-AJB, 2013 WL 6196523,

at *2 (N.D. Ga. Nov. 27, 2013) (denying defendant's motion to reopen detention hearing

because defendant "simply has not offered any further evidence showing that he is not a

flight or safety risk [and he] only reiterates the arguments he presented at his detention

hearing"); *see also United States v. Edwards*, No. 1:05-CR-097-WSD-JFK, 2007 WL

9724771, at *1 (N.D. Ga. May 9, 2007) (Baverman, Magistrate J.) ("On a motion for

reconsideration of detention, . . . the Court places the burden on the defendant to

demonstrate that the initial detention decision was based on erroneous considerations, incomplete or incorrect information, or a material change in circumstances."). Therefore, Fayne's Motion for Reconsideration should be denied. And the hearing currently scheduled for March 1, 2021 should be canceled.

## 1. Statement of Facts

This case began when Fayne was arrested on a Criminal Complaint charging him with bank fraud, in violation of 18 U.S.C. § 1344. (Doc. 144 at 2-3). Because of concern that Fayne might flee if released on bond, the Government contemplated filing a motion for detention at Fayne's initial appearance on May 13, 2020. (*Id*. at 10). The Government's concerns about flight were based on three things. First, Fayne lied to federal agents when he told them that he had not used any of his PPP loan proceeds for personal purposes. (*Id*. at 7-8). Also, a substantial amount of the fraud money was unaccounted for; at least one of the bank accounts that the Government had looked at had been "cleaned out," and large amounts of cash had been withdrawn from, or wire transferred out of, other accounts before the Government could get to them. (*Id*. at 13).

Second, a preliminary search of Fayne's cellphone showed that, shortly after being interviewed by federal agents, Fayne conducted internet searches concerning "countries that will not extradite to the United States," as well as other searches related to extradition and wire-fraud punishment. (*Id*. at 8-9).

Third, when agents went to Fayne's residence to execute a search warrant a few days before arresting him, Fayne attempted to leave through the basement door but stopped when he saw that an agent was posted outside. (*Id*. at 10). When agents later searched Fayne's basement, they found a bag containing $70,000 in cash, which led agents to believe that Fayne would have attempted to leave the premises, rather than submit to the search, if there had not been an agent posted outside the basement door. (*Id*.).

In spite of these red flags, the Government recommended a bond instead of detention. (*Id*.). The Government did so because, immediately after he was interviewed by federal agents, Fayne hired an attorney. (*Id*. at 12). And after learning that a warrant had been issued for Fayne's arrest, Fayne's attorney arranged for Fayne to surrender himself to the FBI. (*Id*. at 8-9). Only later did the Government learn that the real danger in releasing Fayne on bond was *not* risk of flight *but* danger to the community.

Since the Government did not move for detention at Fayne's initial appearance, the Magistrate Judge released Fayne on bond with the following conditions:

> **THE COURT:**  You're to avoid all contact, directly or indirectly, with anyone who you have reason to believe would be a victim or potential witness in this case. And I encourage the government to give Ms. Miller a list of potential witnesses or participants to put Mr. Fayne on as much notice as possible; however, if they fail to do that, that's not an excuse. If there's someone who it is later proven that you knew or very well should have known was a potential witness, meaning anyone who has any

firsthand knowledge of the facts of this case, you're not to speak to that
person about this case yourself or through any intermediaries other than
your lawyer or investigators working for your lawyer.

(*Id*. at 23-24).

The Magistrate Judge further instructed Fayne not to commit any federal, state, or

local offenses while on release. (*Id*. at 27). And the Magistrate Judge warned Fayne that

"a violation of bond is grounds to revoke the bond, . . . meaning put back in jail for the

remainder of the case." (*Id*. at 21). A written Order setting conditions of release followed.

(Doc. 9).

On May 18, 2020, Fayne's Probation Officer sent Fayne a list of potential

witnesses. (Doc. 145 at 17, 19-20; Doc. 154-1). Jimia Cain's name was not on that "DO

NOT CONTACT" list because, at that time, the Government did not know about Cain.

(Doc. 145 at 26). But the investigation continued, and that led to new and different

charges being filed against Fayne, including wire fraud and conspiracy charges related to

a Ponzi scheme.[1] (*Id*.). Jimia Cain is a victim of that Ponzi scheme and therefore a potential witness to that part of the case. (*Id*. at 32).

The charges related to the Ponzi scheme were first lodged against Fayne when the original Indictment was returned on June 24, 2020. (Doc. 17 ¶¶ 1-3). That was more than four months before Fayne violated his release conditions by texting Cain in November 2020. Fayne knew before the Government did that Cain was a victim of the Ponzi

---

[1] On June 24, 2020, Fayne was indicted on three counts of wire fraud, in violation of 18 U.S.C. § 1343; one count of bank fraud, in violation of 18 U.S.C. § 1344; one count of making a false statement to a financial institution insured by the FDIC, in violation of 18 U.S.C. § 1014; ten counts of concealment money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and three counts of transactional money laundering, in violation of 18 U.S.C. § 1957. (Doc. 17).

On July 28, 2020, the grand jury returned a First Superseding Indictment, adding Daniel Eric Jay as a Defendant on the bank-fraud count, and leaving all charges against Fayne intact. (Doc. 41).

On November 19, 2020, the grand jury returned a Second Superseding Indictment. (Doc. 96). It charges Fayne, Jay, and two new Defendants—Michael D. Sargent and Mark T. Sargent—with one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; and three counts of wire fraud, in violation of 18 U.S.C. § 1343. It also charges Fayne and Jay with one count of bank fraud, in violation of 18 U.S.C. § 1344. And it charges Fayne with one count of making a false statement to a financial institution insured by the FDIC, in violation of 18 U.S.C. § 1014; ten counts of concealment money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); three counts of transactional money laundering, in violation of 18 U.S.C. § 1957; and one count of aggravated identity theft, in violation of 18 U.S.C. § 1028A. (Doc. 96).

scheme. (Doc. 145 at 27). He knew and he had reason to know—because Cain had invested hundreds of thousands of dollars in *his* business. (*Id*.).

Even though Cain's name was not on the "DO NOT CONTACT" list, the Magistrate Judge had already warned Fayne not to speak directly to anyone that Fayne "knew or very well should have known was a potential witness, meaning anyone who has any firsthand knowledge of the facts of this case." (Doc. 144 at 23-24). And the Magistrate Judge also warned Fayne that even if the Government failed to provide him with a list of potential witnesses, "that's not an excuse." (*Id*.).

On May 29, 2020, Jimia Cain filed a civil lawsuit against Fayne, Fayne's ex-wife,[2] and Fayne's trucking company. That suit seeks to recover money that Cain lost by investing in Fayne's trucking company. (Doc. 145 at 15). Shortly after Cain filed her lawsuit, two "thugs" came to her house and tried to intimidate her into dismissing her lawsuit against Fayne. (*Id*. at 5).

---

[2] Fayne's ex-wife received a lot of the fraud proceeds, and the Government obtained a seizure warrant to seize $50,000 from her bank account. (Case Number: 1:20-MJ-387-JSA).

Sometime during the week of November 2, 2020, Fayne texted Cain and told her to leave his ex-wife alone. (*Id*. at 5-6). Cain replied:  "I will do everything in my power to help them put you in jail because what you did was wrong." (*Id*. at 6). Fayne responded: "Ha ha. I won't spend a day in jail." (*Id*.).

On November 9, 2020, Fayne sent another text message to Cain, threatening to file a lawsuit against Cain for harassment, trespassing, and hot checks if Cain did not immediately dismiss her lawsuit against him. (*Id*.). Fayne also said to Cain, "I have warned you of the trespass[3] you all are doing. You don't scare me. I'm private trust

---

[3] This is part of the same sovereign-citizen litigation strategy that Fayne employed while proceeding *pro se* in the criminal case now before this Court. (*See e.g.,* Doc. 28, 29, 31, 32, 33, 35, 36, 54, 61, 76, 83, 84, 92, 113, 129). Fayne seems to think that this strategy is tantamount to a "get-out-of-jail-free card." Unfortunately for him, that is not the case. *See United States v. Hakim*, No. 1:18-CR-126-MLB-AJB, 2018 WL 6184796, at *7 (N.D. Ga. Aug. 22, 2018) (Baverman, Magistrate J.) ("Not surprisingly, a prisoner cannot write his own get-out-of-jail-free card by making declarations that amount to a renunciation of his obligation to conform his conduct to the requirements of the nation's criminal laws.") (citation omitted), *report and recommendation adopted*, 2018 WL 4791085 (N.D. Ga. Oct. 4, 2018). "[A]n individual does not immunize himself from the jurisdiction of the state or federal courts" simply by calling himself a sovereign citizen. *Utah Dep't of Workforce Servs. v. Geddes*, No. 2:13-CV-24 TS, 2013 WL 1367025, at *2 (D. Utah Apr. 4, 2013). "Jurisdiction is a matter of law, statute, and constitution, not a child's game wherein one's power is magnified or diminished by the display of some magic talisman." *McCann v. Greenway*, 952 F. Supp. 647, 651 (W.D. Mo. 1997). Likewise, a court's jurisdiction is not defeated "by the use of special seals . . . on documents, or by the recital of special words, phrases[,] or arcane incantations, whether capitalized in written text or not." *Richmond v. Wampanoag Tribal Court Cases*, 431 F. Supp. 2d 1159, 1182 (D. Utah 2006) (capital letters omitted). As

property. Y'all will pay very soon. You can't sue private private [sic] property. Good luck and trust all courts with [sic] see my IPP status." (*Id*.; *see also* copies of text messages between Fayne and Cain, which were introduced at the revocation hearing (doc. 145 at 9) and which are attached hereto as Ex. 1).

Fayne admits that Jimia Cain was *not the first* victim or witness that he contacted in this case, in violation of his release conditions; he also contacted a witness who works for United Community Bank, the victim of the bank fraud alleged in the Criminal Complaint and the Indictment. (Doc. 145 at 37). Fayne told the Magistrate Judge that, after he contacted the witness who works for the victim bank, he received a call from his Probation Officer, who said, "[H]ey, you weren't supposed to contact the bank." (*Id*.). According to Fayne, his lawyer apologized, "and then that's when [Fayne] got the first list of names" from his Probation Officer. (*Id*.). Thus, Fayne violated the "DO NOT CONTACT" condition of his release, not once but twice.

_____

the Eleventh Circuit noted in *United States v. Sterling*, courts summarily reject as "frivolous" the legal theories of so-called sovereign citizens. 738 F.3d 228, 233 n.1 (11th Cir. 2013).

After learning that Fayne had contacted Jimia Cain, Fayne's Probation Officer filed a Petition for Revocation alleging that Fayne had violated the Condition of Release that required him to avoid all contact, directly or indirectly, with anyone who Fayne had reason to believe would be a victim or potential witness in this case. (Doc. 145 at 4-5). As a result, the Magistrate Judge conducted a revocation hearing on December 22, 2020. (Doc. 145).

The Magistrate Judge found by clear and convincing evidence that Fayne had "violated the condition of pretrial release preventing contact with potential witnesses." (Doc. 126). Specifically, the Magistrate Judge found that, on November 9, 2020, Fayne "sent text and email messages to [Jimia Cain,] a potential witness, and to the witness's lawyer, accusing them of asserting false claims against him, and demanding that they withdraw any claims, stop 'harassing' [him], and threatening to take unclear legal or other action against them if they did not comply." (*Id.*). The Magistrate Judge also found by clear and convincing evidence that Fayne is not likely to abide by any conditions of release. (*Id.*). Thus, pursuant to 18 U.S.C. § 3148(b)(1) & (2), the Magistrate Judge Ordered that Fayne's bond be "REVOKED and that he be DETAINED through trial and, if applicable, sentencing." (*Id.*).

On January 4, 2021, Fayne filed a Motion for Reconsideration asking the Magistrate Judge to revoke his Detention Order and reinstate his bond. Fayne argues that

he should be released on bond because "witness Jimia Cain was not on the Bond conditions paperwork nor the Text message that Probation officer Tutor [sic] sent the Defendant, as a person NOT to contact." (Doc. 129 at 2). "Fayne admits that he did have contact with witness Jimia Cain on November 9, 2020." (Doc. 152 at 4). But Fayne argues that *he* is not at fault and that the Magistrate Judge, the Government, and the Probation Officer are to blame. (*See Id*. at 4-5; Doc. 129 at 1). Fayne alleges that, although the Magistrate Judge "notified him orally at the bond hearing that he should not be in contact with any victims or witnesses, the written bond conditions did not contain the names of any victims or witnesses." (Doc. 152 at 4). And Fayne blames his probation officer and the prosecutor for failing to include Jimia Cain on the "DO NOT CONTACT" list. (Doc 129 at 1).

Alternatively, Fayne argues that the text messages he sent to Jimia Cain pertained solely to a civil "lawsuit she had filed against him in Washington state [and have nothing to do with] the current federal [criminal] case here." (Doc. 152 at 5).

In addition, Fayne asserts that he is "concerned for his health" because he has a "history of Asthma" and thus is "at a higher risk for complications due to Covid-19." (*Id*. at 6).

Finally, Fayne asserts that, if the Court decides to release him on bond and determines that additional conditions are necessary, he "will abide by those conditions."

(Doc. 152 at 5-6). Fayne suggests that the additional conditions could include "home detention, change of phone number for Mr. Fayne, blocking any numbers that may be associated with Ms. Cain or other witnesses, requiring that Mr. Fayne to use only one phone[,] and regularly producing that that [sic] phone to be searched by his probation officer for improper conduct." (*Id*. at 6).

**2.    Argument and Citation of Authority**

**(A)    This Court should deny Fayne's Motion for Reconsideration because Fayne fails to meet either part of the two-part test set forth in 18 U.S.C. § 3142(f)(2).**

Under 18 U.S.C. § 3142(f)(2), a detention hearing may be reopened only if the Court finds two things:

- "information exists that was not known to the movant at the time of the hearing," and
- the new information "has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of [the defendant] as required and the safety of any other person and the community."

18 U.S.C. § 3142(f)(2); *see United States v. Hare*, 873 F.2d 796, 799 (5th Cir. 1989) (holding that a detention hearing should not be reopened unless the movant presents "new evidence . . . that has a material bearing on the issue [of risk of flight or dangerousness]") (quoting 18 U.S.C. § 3142(f)(2) (brackets in original); *accord Saintvil*, 2013 WL 6196523, at *2; *Edwards*, 2007 WL 9724771, at *1.

**(1)     The information that Fayne presents is not new.**

Reopening a detention hearing is unwarranted if the evidence on which the movant relies was available at time of the previous hearing. *United States v. Dillon*, 938 F.2d 1412, 1415 (1st Cir. 1991). "Indeed, as § 3142(f)(2) makes clear, the sole purpose of reopening a detention hearing is to give the moving party an opportunity to present evidence that was unavailable at the initial detention hearing." *United States v. Dermen*, 800 F. App'x 665, 669 (10th Cir. 2020). Before the hearing can be reopened, the "defendant must first establish that the information was not previously known to him. Courts interpret this requirement strictly, requiring a showing of truly changed circumstances or a significant event." *United States v. Bothra*, No. 20-1364, 2020 WL 2611545, at *1 (6th Cir. May 21, 2020); *United States v. Pon*, No. 3:14-CR-75-J-39PDB, 2014 WL 3340584, at *3 (M.D. Fla. May 29, 2014) ("Courts have interpreted [18 U.S.C. § 3142(f)(2)] strictly, holding that reopening is unwarranted if the newly offered evidence was available at the time of the hearing."); *United States v. Aguiar*, No. 2:05-CR-021-01-WCO, 2006 WL 8441014, at *2 (N.D. Ga. Oct. 2, 2006) (holding that the magistrate judge correctly "found that defendant could not reopen the detention order because the correct facts were not unknown to defendant at the time of the detention hearing") (O'Kelley, J.).

Furthermore, "conclusory allegations that the information . . . was newly discovered" will not suffice; a party seeking to reopen a detention hearing must show

"how the evidence was discovered or why it had been previously unavailable." *United States v. Stanford*, 341 F. App'x 979, 984 (5th Cir. 2009).

Fayne's Motion for Reconsideration offers no information concerning Jimia Cain that was unknown to Fayne at the time of the revocation hearing.

**(a)   At the revocation hearing, Fayne argued that his communications with Jimia Cain had nothing to do with this case and that he had no reason to suspect that she might be a witness in this case; this Court explicitly rejected those arguments.**

At the revocation hearing, Fayne made the following arguments:

- "Jimia Cain has a total separate civil case that she's suing my ex-wife, myself and a former company that I owned. All of the text messages are not here. She actually reached out to me first. . . . And my only conversations with Ms. Jimia Cain had nothing to do with this case whatsoever, not one single word, conversation. It was strictly on a civil case that we have in the State of Washington." (Doc. 145 at 15).

- "Jimia Cain, she had a crush on me. She was a lady that was trying to be intimate with me." (*Id*. at 17-18).

- "[M]y probation officer . . . gave me a list of people that I do not need to contact." (*Id*. at 17). Jimia Cain's "name was not listed. (*Id*. at 22).

- "I just didn't know she was a potential witness [in] this case." (*Id*. at 39).

- " I haven't seen her lawsuit. Now, my ex-wife has." (*Id*. at 40).

This Court disagreed with Fayne and Ordered him detained:

> **THE COURT:**  I do find the defendant has violated his conditions of release. The conditions stated that the defendant was not to have contact directly or indirectly with anyone who would be a potential witness in the case. And I was very clear. I was extremely clear. Mr. Phillips read [part of the transcript of the bond hearing, specifically Doc. 144 at 23-24] here this morning. I didn't need him to, because it's what I say in every case, but I was very clear as to what I meant by that. I meant -- I encouraged the government to give you a list, but I was very clear that that list was not the complete list of the folks you were supposed to avoid. It was to give you, as much as they could, a list, but I also made very clear it was to include anyone else, whether listed or not, whether named in the indictment or listed by the government in this list or not, that you knew were potential victims or participants or had knowledge, firsthand knowledge, about the facts of the case. So you focused this morning on it wasn't on the list, I wasn't told, so if I wasn't told not to talk to them, then I could talk to them. That's not the order that -- or the condition of release that was in place. It didn't work that way. And I could not have been clearer. . . . And what I said wasn't legalese, it was crystal clear, you are not to speak to anyone directly or indirectly about this case that's a potential victim or witness, and that was not limited to the people they gave you a list of. So then the question is, is this person, Ms. Cain, a potential victim or witness, and I believe she is, that that's been established here. . . . [The] allegations [in her] civil case . . . mirror the claims in this criminal case.

(*Id*. at 30-32).

> **THE COURT:**  And I can't find that you weren't on notice that this was a potential witness, because from what I'm hearing, the subject matter of her claims is exactly the subject matter of the fraud scheme that's in the complaint. She's even referencing being a part of the group that's going to put you away, so she's clearly referencing that she's involved in criminal matters against you.

(*Id*. at 33).

> **THE COURT:**  I could not have been clearer [at the original bond hearing] when I said not getting the list, someone's name on a list, will not be an excuse. . . . [T]hat was not ambiguous. . . . I told you clearly myself looking in your eyes that . . . you cannot contact potential victims or witnesses and it does not matter whether they're listed, that does not make it right.

(*Id*. at 38-39).

### (b)   In his Motion for Reconsideration, Fayne merely restates the arguments that he made and lost at his revocation hearing.

In his Motion for Reconsideration, Fayne makes the following arguments:

- Although the Magistrate Judge "notified [Fayne] orally at the bond hearing that he should not be in contact with any victims or witnesses, the written bond conditions did not contain the names of any victims or witnesses." (Doc. 152 at 4).

- The probation officer and the prosecutor failed to include Jimia Cain on the "DO NOT CONTACT" list. (Doc 129 at 1).

- Alternatively, the text messages that Fayne sent to Jimia Cain pertained solely to a civil "lawsuit she had filed against him in Washington state [and have nothing to do with] the current federal [criminal] case here." (Doc. 152 at 5).

Fayne's Motion merely repackages the arguments that he made and lost at the revocation hearing. Having offered no *new* information on the specific issue that led to his detention—*i.e.,* his communications with witness Jimia Cain—Fayne is not entitled to reopen his detention hearing, and his Motion for Reconsideration should be denied. *See* 18 U.S.C. § 3142(f)(2); *Edwards*, 2007 WL 9724771, at *1; *Saintvil*, 2013 WL 6196523, at *2.

Fayne's Motion does not address the fact that Fayne had previously violated this same condition of release by contacting a witness who worked for United Community Bank, the victim of the bank fraud alleged in the Indictment. (*See* Doc. 145 at 37). As Judge Baverman said in *Martin*, "'sending signals' is not a legitimate purpose of a § 3148(b)(1) proceeding, but if it was, ignoring [this] Defendant's violations certainly would send the 'wrong signal.'" 2006 WL 2590888, at *2.

### (2)     The information that Fayne presents is not material.

New information is not deemed "material" unless it increases "the likelihood that the defendant will appear at trial and [shows] that the defendant is less likely to pose a danger to the community." *United States v. Watson*, 475 F. App'x 598, 600 (6th Cir. 2012); *see also United States v. Leake*, No. 19-CR-194 (KBJ), 2020 WL 1905150, at *1 (D.D.C. Apr. 17, 2020) (holding that, to be considered "material," the new information must pertain to one of the four factors set forth in 18 U.S.C. § 3142(g): (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release); *United States v. Jerdine*, No. 1:08 CR 00481, 2009 WL 4906564, at *3 (N.D. Ohio Dec. 18, 2009) ("New and material information for Section 3142(f)(2)(B)

purposes consists of . . . truly changed circumstances, something unexpected, or a significant event."), *aff'd,* 511 F. App'x 391 (6th Cir. 2013).

Fayne's Motion for Reconsideration offers no information that has a material bearing on the issue whether there are conditions of release that will reasonably assure his appearance as required and the safety of any other person and the community. *See* 18 U.S.C. § 3142(f)(2).

Also, Fayne's generalized health concerns are insufficient to warrant reconsideration of his detention order for at least five reasons. First, "[t]he existence of the Coronavirus pandemic—and its effect on [Fayne's] health . . . is not material to either the likelihood that [Fayne] will appear or to the risk posed to the public if he is released." *United States v. Ramadan*, 458 F. Supp. 3d 657, 662 (E.D. Mich. 2020), *aff'd,* No. 20-1450, 2020 WL 5758015 (6th Cir. Sept. 22, 2020); *see also United States v. Clark*, 448 F. Supp. 3d 1152, 1156 (D. Kan. 2020) (holding that defendant's concerns about contracting COVID-19 while incarcerated do not factor into a § 3142(f) analysis, which focuses on whether the defendant is a flight risk or a danger to the community, and stating that "[t]he risk of harm *to the defendant* does not usually bear on this analysis"); *United States v. Rowe-Hodges*, 454 F. Supp. 3d 618, 622 (E.D. Tex. 2020) (denying motion to reconsider the issue of detention where defendant suffered from asthma and was required "to use a home nebulizer on a regular basis," because defendant "offered no new information or

evidence that has a material bearing on the issue of whether there are conditions of release that will reasonably assure his appearance and the safety of any other person and the community").

Second, Fayne does not allege that he currently has COVID-19 symptoms or that since he has been locked up, he has been exposed to an individual who tested positive for COVID-19. *See Bothra*, 2020 WL 2611545, at *1 (holding that "a generalized risk of contracting COVID-19" does not constitute a material change of circumstances warranting review of a detention order); *United States v. Ford*, 455 F. Supp. 3d 512, 521 (S.D. Ohio 2020) (holding that "mere possibility of contracting COVID-19" is not a compelling enough reason to justify defendant's release).

Third, Fayne provides no evidence that his confinement increases his risk of actually *contracting* COVID-19. Moreover, Fayne does not say whether the detention facility he is assigned to has implemented any COVID safety measures and, if so, whether such measures have been effective, nor does he provide any insight as to the exposure levels of the people he proposes to live with if released. Thus, he "fails to establish that releasing him would put him at a *lower* risk of contracting COVID-19." *United States v. Lewis*, No. 19-60034-CR, 2020 WL 6262984, at *4 (S.D. Fla. Oct. 23, 2020).

Fourth, Fayne has not demonstrated that his asthma condition warrants his release. *See id.* (noting that "virtually every person over the age of 50 has some health condition that could conceivably put that person at a greater risk of succumbing to the coronavirus, but this does not entitle every inmate over 50 to be released") (citation omitted).

Fifth, Fayne does not dispute that he suffered from the very same asthma condition "when he was working to steal the victims' hard-earned money." *Id.* (citing *United States v. Stuyvesant*, 454 F. Supp. 3d 1236, 1244 (S.D. Fla. 2020) ("The Court cannot agree that a defendant who is physically and mentally well enough to commit a serious federal crime is somehow not well enough to serve the sentence to which that crime inevitably exposes him.")).

**(B)** **This Court should not exercise its inherent authority to reconsider its previous ruling.**

As originally passed, the Bail Reform Act of 1984 did not include a "reopening" provision; the First Circuit concluded that the omission must have been inadvertent and held that "the magistrate and district court nonetheless possess inherent power to reconsider previous detention orders." *United States v. Angiulo* 755 F.2d 969, 972 (1st Cir. 1985). The following year, Congress added the reopening provision codified at 18 U.S.C. § 3142(f)(2). *See* Criminal Law and Procedure Technical Amendments Act of 1986, Pub. L. No. 99–646, 100 Stat. 3592 (1986). A Senate Judiciary Committee report

explained that the addition of this reopening provision sought to "clarify that a court has the authority to reopen a detention hearing to consider further relevant information *not known to the movant at the time of the original hearing*." S. Rep. No. 99-278, at 2 (1986) (emphasis added). Thus, 18 U.S.C. § 3142(f)(2) codifies "a court's inherent reconsideration authority tempered by the understanding that, to promote finality, preserve judicial resources, and discourage piecemeal presentations, a court should not reconsider a decision based on information that could have been presented the first time around." *Pon*, 2014 WL 3340584, at *9; *see also Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 817, 108 S. Ct. 2166, 2178, 100 L. Ed. 2d 811 (1988) (stating that, "as a rule courts should be loathe to [revisit their prior rulings] in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice") (citation and quotation marks omitted).

> **(1)    If this Court were to exercise its inherent authority to reconsider Fayne's Detention Order without requiring Fayne to meet both prongs of the test set forth in 18 U.S.C. § 3142(f)(2), it would negate that provision.**

"[E]ven if an inherent reconsideration authority remains after the addition of the reopening provision to the Bail Reform Act," *Pon*, 2014 WL 3340584, at *10, Fayne's Motion for Reconsideration should be denied without a hearing. A court has inherent authority to "reconsider, rescind, or modify an interlocutory order" only in the "absence of prohibition by statute or rule." *Flintlock Const. Servs., LLC v. Well-Come Holdings,*

*LLC*, 710 F.3d 1221, 1225 (11th Cir. 2013); *see also United States v. Barragan-Mendoza,* 174 F.3d 1024, 1028 (9th Cir. 1999) (holding that, while district courts generally have inherent authority to decide motions for reconsideration in criminal proceedings, they may not exercise that authority in the face of an "express rule to the contrary"); *United States v. Jetton*, No. 1:05-CR-316-8-BBM, 2008 WL 11384040, at *2 (N.D. Ga. Oct. 9, 2008) (Martin, J.) (holding that a district court may not exercise its inherent authority to decide a motion for reconsideration "in the face of an express prohibition of reconsideration of a particular issue") (citation omitted). Here, the reopening provision in 18 U.S.C. § 3142(f)(2) controls. *See Pon*, 2014 WL 3340584, at *10 ("stating that "the Bail Reform Act's reopening provision—with its new-and-material-fact prerequisite—applies"). Hence, if this Court were to reconsider Fayne's Detention Order based on its inherent authority—without requiring Fayne to meet both prongs of the test set forth in § 3142(f)(2)—it "would negate that provision." *Id*.

Also, allowing Fayne to bypass the requirements of § 3142(f)(2) would undermine the Bail Reform Act, which provides that a defendant unhappy with his detention order may appeal the magistrate judge's ruling to the district court and appeal the district court's ruling to the court of appeals. *Pon*, 2014 WL 3340584, at *10 (citing 18 U.S.C. § 3145(b) & (c)).

> **(2)**   **Fayne's Motion for Reconsideration should be denied because Fayne has not met his burden of demonstrating that his Detention Order was based on erroneous considerations, incomplete or incorrect information, or a material change in circumstances.**

"[N]o statute or Federal Rule of Criminal Procedure authorizes the filing of a motion for reconsideration in a criminal case." *United States v. Vives*, 546 F. App'x 902, 905 (11th Cir. 2013). Thus, when courts in this district have entertained motions for reconsideration in criminal cases, "they have generally employed those standards underlying civil motions for reconsideration." *United States v. Kight*, No. 1:16-CR-99-WSD, 2018 WL 10700899, at *2 n.3 (N.D. Ga. Mar. 22, 2018).

"Motions for reconsideration, assuming they are even appropriate in criminal cases, 'should be reserved for certain limited situations, namely the discovery of new evidence, an intervening development or change in the law, or the need to correct clear error or prevent a manifest injustice.'" *Kight*, 2018 WL 10700899, at *2 (quoting *Brinson v. United States*, No. 1:04-CR-0128-01-RWS, 2009 WL 2058168, at *1 (N.D. Ga. July 14, 2009) (Story, J.)); *see also Pon*, 2014 WL 3340584, at *10 ("[I]n civil and criminal cases alike, the exercise of inherent reconsideration authority is prudently reserved for instances in which . . . the court applied the wrong law, the court overlooked a material fact, or to do otherwise would result in an injustice."). "In those instances, correction of the error to avoid the need for district-judge or appellate-court review with inevitable results promotes judicial efficiency. The exercise of inherent reconsideration authority

based on information or arguments that a party could have presented the first time around, on the other hand, does not." *Pon*, 2014 WL 3340584, at *10.

Therefore, a motion for reconsideration "may not be employed as a vehicle to tender new legal theories or to introduce new evidence that could have been presented in conjunction with the previously filed motion or response." *Escareno v. Noltina Crucible & Refractory Corp.*, 172 F.R.D. 517, 519 (N.D. Ga. 1994) (Carnes, J.). "A motion for reconsideration is not an opportunity for the moving party and their counsel to instruct the court on how the court 'could have done it better' the first time." *Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Engineers*, 916 F. Supp. 1557, 1560 (N.D. Ga. 1995) (O'Kelley, J.), *aff'd*, 87 F.3d 1242 (11th Cir. 1996). "Similarly, motions for reconsideration may not be used to present the court with arguments already heard and dismissed," *id.*, or to "repackage familiar arguments to test whether the Court will change its mind," *Brogdon ex rel. Cline v. Nat'l Healthcare Corp.*, 103 F. Supp. 2d 1322, 1338 (N.D. Ga. 2000) (Murphy, J.). "If a party presents a motion for reconsideration under any of these circumstances, the motion must be denied." *Lewis v. Nationstar Mortg., LLC*, No. 1:18-CV-4455-MHC-AJB, 2019 WL 5460662, at *1 (N.D. Ga. Aug. 2, 2019) (Cohen, J.) (quoting *Bryan*, 246 F. Supp. 2d at 1259).

Fayne has not met his burden of demonstrating that his Detention Order was based on "erroneous considerations, incomplete or incorrect information, or a material change

in circumstances." *Edwards*, 2007 WL 9724771, at *1. Therefore, his Motion for

Reconsideration should be denied.

With respect to Fayne's request that his bond be reinstated with additional

conditions—based on his promise to abide by those conditions—Judge Baverman

rejected a similar request in *United States v. Martin*:

> Martin presents an alternative to revoking his release by proffering that
> removing computers from his household and preventing his access to any
> computers, in order to forestall any further trading, are additional
> conditions with which he would abide. The Court disagrees. The release
> conditions violated by Martin could not have been more clear. They
> specifically applied to trading on his own behalf as well as for third parties.
> At the hearing when bond was set and the release terms were imposed, the
> Court made it clear that Martin could not trade in securities for any
> purpose, and that one of the consequences for doing so would be revocation
> of release. Additional conditions imposed to prevent the exact same
> mischief do not convince the Court that Martin is any more likely to
> comply with those conditions, given that his need for funds remains the
> same.

No. 1:06-CR-286 TCB-AJB, 2006 WL 2590888, at *3 (N.D. Ga. Sept. 7, 2006). Judge

Baverman's reasoning in *Martin* is sound, and the Government respectfully asks this

Court to follow it here.

### (C)    This Court should cancel the hearing currently scheduled for March 1, 2021.

There is no need for this Court to conduct another hearing on the subject of detention

because Fayne has offered no new and relevant information. Furthermore, any

information that the Government would present at a new hearing would only make it less likely that the Court would reinstate Fayne's bond. *See United States v. Little*, No. CR20-149 RAJ, 2020 WL 6203099, at *1 (W.D. Wash. Oct. 22, 2020) ("The Court does find that there is new information relevant to Defendant's bail determination but that the new information supports the continued detention of Defendant and therefore a new hearing before this Court is not appropriate.").

> **(1)   If Fayne's detention hearing is reopened, the Government will introduce evidence that Fayne lied at the revocation hearing.**

Giving materially false information at a bond hearing constitutes obstruction of justice. *United States v. Prozer*, 544 F. App'x 844, 845 (11th Cir. 2013) (citing *United States v. Doe*, 661 F.3d 550 (11th Cir. 2011)). "Material" means that the information, if believed, "would tend to influence or affect the issue under determination." *United States v. Doe*, 661 F.3d 550, 566 (11th Cir. 2011) (citation omitted). "The relevant considerations are the kind of information provided and its tendency to influence the court, not the actual effect of a particular misstatement." *United States v. Bedolla-Zavala*, 611 F.3d 392, 396 (7th Cir. 2010). Information that sheds light on a defendant's honesty "is a highly relevant factor in determining whether a defendant should remain in custody or be granted bond, and thus is material not only at sentencing, but at arraignment." *Id.*; *see also United States v. Tann*, No. CRIM.A.04-392(CKK), 2006 WL 1313334, at *5 (D.D.C. May 12, 2006) (denying defendant's request for a hearing on her bond motion because defendant's

behavior "forces the Court to question her personal characteristics, such as her capacity

for honesty, her respect for the law, and her ability to be cabined by legal consequences").

> **(a)**   **Fayne knew that Jimia Cain had invested hundreds of thousands of dollars in *his* trucking business and that Cain was suing *him* personally to recover the money that *he* had stolen from her; therefore, Fayne lied at the revocation hearing when he stated that the reason Cain was suing him had nothing to do with this case and that he just didn't know she was a potential witness.**

Fayne lied to the Magistrate Judge at the revocation hearing when he stated that the

reason Jimia Cain was suing him "had nothing to do with this case" and that he "just

didn't know she was a potential witness." (Doc. 145 at 39). It is beyond dispute that

Fayne's statements were material to the issue of detention.

At the revocation hearing, the Magistrate Judge found that the allegations in Jimia

Cain's civil complaint "mirror the claims in this criminal case." (*Id*. at 32). Even so,

without having had an opportunity to conduct a side-by-side comparison of Cain's civil

complaint and Fayne's Indictment, the Court might not have realized that Fayne's claim

that Cain's civil lawsuit "had nothing to do with this case" (*id*. at 39) was an outright lie,

not a mere misunderstanding or a difference of opinion. *See United States v. Ramadan*,

458 F. Supp. 3d 657, 664 (E.D. Mich. 2020) (denying defendant's motion for release

from pretrial detention because of defendant's "lies, deceitful activity and general

untrustworthiness, [which] further increases his risk of flight and the danger he would

pose to the community if he were released"), *aff'd*, No. 20-1450, 2020 WL 5758015 (6th Cir. Sept. 22, 2020).

If Fayne's detention hearing is reopened, the Government will introduce Jimia Cain's civil complaint against Fayne (a copy of which is attached hereto as Ex. 2). Cain's civil complaint, which was filed in the Superior Court of Benton County, Washington on May 29, 2020, alleges, in relevant part, as follows:

> From at least 2014 to the present date, defendant Maurice Fayne . . . , Defendant FAYNE TRUCKING, LLC, . . . and others . . . fraudulently induced plaintiff Jimia Cain . . . to loan hundreds of thousands of dollars to them by means of misrepresentations and with no intent to repay them. They have conducted similar frauds against others, by means of wire communications in interstate commerce, in several states, and judgments have accordingly been entered against them in consequence of some of that wrongdoing[.] [Fayne's wife] knowingly reaped the benefits of Mr. Fayne's fraud and caused two men to threaten Ms. Cain with violence if she did not discontinue this action.

(*Id*. ¶ 1.1).

Cain's civil complaint plainly and unambiguously alleges claims against Fayne that arise from Cain's investment in Fayne's *trucking* company; in fact, the words *truck* and *trucking* appear 100 times in Cain's complaint. (*See id*.). Likewise, the Indictment in this case plainly and unambiguously charges Fayne with conspiracy and wire fraud arising from a Ponzi scheme that defrauded more than 20 investors in that same *trucking* company. (*See* Doc. 41 ¶¶ 1-3; Doc. 96 ¶¶ 1-7). Therefore, it defies logic and common sense for Fayne to suggest—as he did at the revocation hearing (*see* doc. 145 at 15, 17,

19, 39) and as he does again in his Motion for Reconsideration (*see* doc. 152 at 5)—that

Cain's civil lawsuit has nothing to do with this case. *See Holsworth v. Berg*, No. CIV.A.

05-1116, 2005 WL 1799409, at *3 (E.D. Pa. July 26, 2005) ("Not only are [defendant's]

excuses patently insufficient to meet the legal standard for a motion for reconsideration,

but they are also insulting to this Court."), *aff'd*, 322 F. App'x 143 (3d Cir. 2009).

> **(b)**     **Fayne knew that Jimia Cain had filed a civil lawsuit against him because a process server personally handed the summons and complaint to him on June 12, 2020; therefore, Fayne lied at the revocation hearing on December 22, 2020 when he stated that he had not seen Jimia Cain's lawsuit.**

At the revocation hearing, Fayne told the Magistrate Judge that he had never seen Jimia

Cain's lawsuit. (Doc. 145 at 40). That was an outright lie. If Fayne's detention hearing is

reopened, the Government will introduce the Affidavit of Service filed by the process

server who personally served Cain's summons and complaint on Fayne (a copy of which

is attached hereto as Ex. 3). It states, in relevant part, as follows:

> On the 12th day of June, 2020 at 7:11 PM at the address of 4029 MOUNTAIN SIDE TRAIL, DACULA, Gwinnett County. GA 30019; this declarant served the above described documents upon MAURICE FAYNE and KARLIE REDD by then and there personally delivering 2 true and correct copy(ies) thereof, by then presenting to and leaving the same with MAURICE FAYNE, REGISTERED AGENT, SPOUSE, who tried to refuse service by refusing to take documents and did not state reason for refusal, with identity confirmed by subject saying yes when named, a bald black male approx. 45-55 years of age, 5'6"-5'8" tall and weighing 140-

160 lbs., a person of suitable age and discretion who stated they reside at the defendant's/respondent's usual place of abode listed above.

(*Id.*).

> **(2)     If Fayne's detention hearing is reopened, the Government will introduce evidence that Fayne committed federal crimes while on release.**

A court is required to revoke a previous release order if, after a hearing, it finds "probable cause to believe that the [defendant] has committed a Federal, State, or local crime while on release." 18 U.S.C. § 3148(b)(1)(A). To revoke the release order, the court must also find that "there is no condition or combination of conditions of release that will assure that the [defendant] will not flee or pose a danger to the safety of any other person or the community," or the defendant "is unlikely to abide by any condition or combination of conditions of release." *Id*. § 3148(b)(2). If the court finds "probable cause to believe that, while on release, the person committed a Federal, State, or local felony, a rebuttable presumption arises that no condition or combination of conditions will assure that the person will not pose a danger to the safety of any other person or the community." *Id*. § 3148(b). The phrase *safety of any other person* refers to the danger that the defendant might pose to "a particular identifiable individual, perhaps a victim or witness," while the phrase *safety of the community* "refers to the danger that the defendant might engage in criminal activity to the detriment of the community." *United States v. King*, 849 F.2d 485, 487 n.2 (11th Cir. 1988) (citation omitted).

"Courts have long recognized that 'danger' in the context of § 3148 refers to unlawful conduct, with little distinction between whether the nature of the conduct is economic or physical." *United States v. Wong*, No. CR 12-00645 LEK, 2012 WL 5464178, at *4 (D. Haw. Nov. 8, 2012); *see also United States v. Jalloh*, No. SACR 15-00129-CJC, 2016 WL 4939102, at *1-2 (C.D. Cal. Sept. 13, 2016) (finding probable cause to believe that defendant "committed additional acts of wire fraud, a federal felony" while on release, and ordering that he be detained prior to trial).

The Indictment establishes probable cause to believe that Fayne is a serial fraudster, and "a serious economic danger to the community. Simply stated, [the Indictment alleges that Fayne] repeatedly targets individuals and then defrauds them out of their money." *Jalloh*, 2016 WL 4939102, at *2.

If Fayne's detention hearing is reopened, the Government will introduce evidence that, while on release, Fayne violated the wire-fraud statute in connection with one or more schemes to defraud Rod Darby, Darby's company—CTC Transportation, LLC (CTC)—and a Nebraska corporation called RFG Leasing, Inc. (RFG). In furtherance of these schemes, Fayne provided and caused others to provide false and fraudulent information to the United States Department of Transportation. *See United States v. Ellison*, 804 F. App'x 153, 155-56 (3d Cir. 2020) (affirming defendants' convictions for

conspiracy, wire fraud, and bank fraud arising from "their role in a scheme to violate Department of Transportation ('DOT') regulations").

Darby lives in South Carolina. His company, CTC, operated briefly in 2009 but was dormant until Fayne called him and proposed a deal in late 2019 or early 2020. Fayne said that he owned three trucks, and he said that he wanted to lease them to CTC and pay Darby 10% of the profit.

Fayne never had permission from Darby to enter into contracts on behalf of CTC, and Fayne never had any ownership interest in CTC. On or about November 14, 2019, however, Fayne—acting in the name of CTC—signed a contract to lease three trailers from RFG Leasing. On November 17, 2020, RFG filed civil lawsuit against CTC seeking approximately $35,000 in damages and alleging that CTC (*i.e.,* Fayne pretending to be CTC) defaulted on the lease agreement and failed to return the trailers to RFG. Darby had no knowledge that Fayne had entered into any agreement with RFG until Darby was served with the complaint. Darby never did any business with RFG.

From approximately August 2020 through December 22, 2020 (when Fayne's bond was revoked), Fayne's three trucks secretly operated under CTC's DOT number and under its authority, in violation of DOT rules and regulations. According to Darby, by approximately October 2020, Fayne's three trucks were making approximately $30,000-

$40,000 per month. Darby told federal agents that Fayne never paid him his share of the profits.

Fayne also defrauded Darby by engaging in unauthorized transactions with J.B. Hunt Transport Services, Inc., which has asserted a claim against Darby and CTC for approximately $14,000. Until Fayne got arrested in December 2020, Darby and Fayne were running loads for Amazon through J.B. Hunt. Darby told federal agents that Fayne was (without Darby's knowledge) taking fuel advances from J.B. Hunt, which put Darby "in the hole." Fayne was the only one able to take fuel advances because Fayne prepared and submitted the "packets" to J.B. Hunt. The "packets" falsely showed that CTC was operating in accordance with DOT regulations. Fayne's name was on the "packet," so Fayne was the only person entitled to receive fuel advances. Fayne promised Darby that he would put Darby's name on the packets, but Fayne used his own name instead. *See United States v. Gill*, No. CR S-06-0312LKK(GGH), 2008 WL 2120069, at *1 (E.D. Cal. May 20, 2008) ("Gill was indicted on an alleged wire fraud scheme involving his trucking business. Pared to its essence, the indictment allege[d] that Gill would agree with a party to transport freight, but then hire out the actual transportation of goods with another carrier. . . . Gill would receive payment from the party whose goods were shipped, but Gill would not pay the carriers who he retained.").

The Government has obtained copies of telephone calls that Fayne made while detained at RAD, including the following, which show Fayne conspiring to commit wire fraud by starting new, fictitious trucking companies under false and fraudulent pretenses.

- On December 31, 2020, Fayne called a male associate named Will and an unidentified woman. Together, they called Rod Darby, owner of CTC Transportation in South Carolina. They talked about running Fayne's criminal enterprise from jail and creating another new company (not in Fayne's name) if necessary. Fayne said: "Anything Will ask for, that's good to go cause that's coming directly to me. He wouldn't have your number if I wasn't cool with it. And then as far as DOT, you need to call them to see if they gonna cancel out, so we know if we need to do this other company yet or not. Uh, my name ain't on none of this shit. So, I don't know. I don't know the address. I don't know the PIN number. I ain't, I ain't got access to none of that. You know what I'm saying? So, you gonna have to handle that part so we can keep everything going in transition. . . . [T]hat's $4,000 a week profit, just off that one truck a week."

- On January 19, 2021, Fayne said to Will: "I'm fixing to start working all angles to get Felicia's authority situated real quick. We got to get some movement going." Fayne also told Will to call Ryan and find out "what he needs to get his authority. I thought he was working on it. We got to figure something out to get shit moving."

- On January 20, 2021, Fayne called an unidentified male and said: "If I don't get out of here next week, man, I'm gonna have to just kinda, how can I say this? Pretty much like this. You're going to have to start a new company. I can walk you through the whole process. It'll take about. It'll take about 20 days, 21 days for it to be set up, though. And then money'll start being made immediately. I'll get you access to drivers, trucks, everything. You'll have to go get a bank account. Everything'll be coming to you. Just, you know, we'll just be pretty much be partners. You see what I'm saying? . . . . I'm kinda just preplanning ahead. You know what I'm saying? Just in case, you know. I might stay in here another two weeks. But whatever. I still need. . . We still need the money to be flowing. You see what I'm saying? It don't make sense for me to flow the money right now and can't nobody access it. You see what I'm saying? . . . . Next week, if I don't get out, like I said, we'll set up the business

side of things. You just run it. You know what I'm saying? We'll split it right down the middle, 50-50. You see what I'm saying? I can walk you through everything, how to set up everything, how to get everything going. Get you all the drivers' info, stuff like that. I'll get my phones over to you—for business contacts, etc. You see what I'm saying? Just run it up. You know what I'm saying? Take that as a blessing and run it up. You know what I'm saying?" The man Fayne was talking to said, "I got you 1,000 percent."

Fayne's jail calls show that Fayne has a network of flunkies who assist him in carrying out his fraudulent schemes, and that he routinely provides false and fraudulent documents to government agencies, including the United States Department of Transportation and the Federal Motor Carrier Safety Administration. The Indictment includes similar allegations. (Doc. 96 ¶ 5(f)). This Court may take into account the activities of others that Fayne "supervises and controls" in determining whether Fayne is a danger to the community and whether his supervision of criminal activity can be "curtailed by any condition or combination of conditions of release." *United States v. Ciccone*, 312 F.3d 535, 539-543 (2d Cir. 2002).

**3.**     **Conclusion**

For all of the foregoing reasons, Fayne's Motion for Reconsideration should be denied

without an additional hearing.

Respectfully submitted,

KURT R. ERSKINE
ACTING UNITED STATES ATTORNEY

*Russell Phillips*
RUSSELL PHILLIPS
ASSISTANT UNITED STATES ATTORNEY
GEORGIA BAR NO. 576335

*Bernita B. Malloy*
BERNITA B. MALLOY
ASSISTANT UNITED STATES ATTORNEY
GEORGIA BAR NO. 718905

600 U.S. COURTHOUSE
75 TED TURNER DRIVE, SW
ATLANTA, GA 30303
(404) 581-6000

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 19, 2021, I electronically filed the foregoing document

with the Clerk of Court using the CM/ECF system.

RUSSELL PHILLIPS
ASSISTANT UNITED STATES ATTORNEY
GEORGIA BAR NO. 576335

600 U.S. COURTHOUSE
75 TED TURNER DRIVE, SW
ATLANTA, GA 30303
(404) 581-6000